UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

INFORMED CONSENT ACTION
NETWORK,

*Plaintiff,*

v.

FOOD AND DRUG ADMINISTRATION,

*Defendant*.

Civil Action No. 22-3572 (CKK)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

BACKGROUND ........................................................................................................... 1

LEGAL STANDARD .................................................................................................... 3

ARGUMENT ................................................................................................................. 5

  I.  Plaintiff's Challenge to the Reasonableness of FDA's Search Is Without Merit Because FDA Collected All Autopsy Reports ................................................. 5

  II.  FDA Properly Withheld the Autopsy Reports Under Exemption 6. .................... 6

    A.  The Requested Autopsy Reports Are "Medical Files" or "Similar Files" Covered by Exemption 6. .......................................................................................... 6

    B.  The Decedents' Surviving Family Members Have a Substantial Privacy Interest in Non-Disclosure of the Requested Autopsy Reports. ......................................... 9

      1.  Disclosure of the Autopsy Reports Will Result in Identifying Decedents and Their Surviving Family Members. ................................................. 9

      2.  Once Identified, Surviving Family Members Will Be Subject to Inquiries That Will Cause Additional Mental Anguish. ................................................... 13

    C.  Disclosure of the Autopsy Reports Is Unlikely to Advance Plaintiff's Asserted Public Interest. ........................................................................................ 16

    D.  The Surviving Family Members' Privacy Interests in Non-Disclosure Outweigh the Public Interest in Disclosure of the Autopsy Reports. ........................................ 21

CONCLUSION ........................................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*ACLU v. Dep't of Just.*,
   655 F.3d 1 (D.C. Cir. 2011) ............................................................ 12, 13

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ........................................................................ 3

\* *Badhwar v. Dep't of Air Force*,
   829 F.2d 182 (D.C. Cir. 1987) ...................................................... 8, 9, 15

*Barnard v. Dep't of Homeland Sec.*,
   598 F. Supp. 2d 1 (D.D.C. 2009) ................................................... 17

*Bowen v. FDA*,
   925 F.2d 1225 (9th Cir. 1991) ...................................................... 15, 16

*Carter v. Dep't of Com.*,
   830 F.2d 388 (D.C. Cir. 1987) ...................................................... 23

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ........................................................................ 3

*Citizens for Resp. & Ethics in Wash. v. Dep't of Just.*,
   746 F.3d 1082 (D.C. Cir. 2014) .................................................... 4

*Climate Investigations Ctr. v. Dep't of Energy*,
   331 F. Supp. 3d 1 (D.D.C. 2018) ................................................... 10

*Coleman v. Lappin*,
   607 F. Supp. 2d 15 (D.D.C. 2009) ............................................... 7, 8

*Consumers' Checkbook Ctr. for the Study of Servs. v. Dep't of Health & Human Servs.*,
   554 F.3d 1046 (D.C. Cir. 2009) .................................................... 17

*Dep't of Air Force v. Rose*,
   425 U.S. 352 (1976) ........................................................................ 10

*Dep't of Def. v. Fed. Lab. Rels. Auth.*,
   510 U.S. 487 (1994) ........................................................................ 21

*Dep't of Just. v. Reps. Comm. for Freedom of the Press*,
   489 U.S. 749 (1989) ........................................................................ 4, 17

*Dep't of State v. Wash. Post Co.*,
   456 U.S. 595 (1982) ........................................................................ 7, 16

*Elec. Frontier Found. v. Dep't of Just.*,
   739 F.3d 1 (D.C. Cir. 2014) .......................................................... 4

*Forest Guardians v. Fed. Emergency Mgmt. Agency,*
   410 F.3d 1214 (10th Cir. 2005) ............................................................ 11-12, 14

*Henderson v. Dep't of Just.,*
   157 F. Supp. 3d 42 (D.D.C. 2016) ........................................................... 5, 6

*Henson v. Dep't of Health & Human Serv.,*
   892 F.3d 868 (7th Cir. 2018) ...................................................................... 7

*Jud. Watch, Inc. v. Dep't of Navy,*
   25 F. Supp. 3d 131 (D.D.C. 2014) ............................................................. 7

*Jud. Watch, Inc. v. Dep't of Treasury,*
   248 F. Supp. 3d 87 (D.D.C. 2017) ............................................................. 4

*Jud. Watch, Inc. v. U.S. Secret Serv.,*
   726 F.3d 208 (D.C. Cir. 2013) ................................................................. 11

*Katz v. Nat'l Archives & Recs. Admin.,*
   862 F. Supp. 476 (D.D.C. 1994) .............................................................. 14

*Larson v. Dep't of State,*
   565 F.3d 857 (D.C. Cir. 2009) ................................................................... 4

*Long v. Dep't of Just.,*
   778 F. Supp. 2d 222 (N.D.N.Y. 2011) .................................................. 21, 2

\* *Marzen v. Dep't of Health & Human Servs.,*
   825 F.2d 1148 (7th Cir. 1987) .................................................. 14, 15, 16, 23, 25

*McWatters v. Bureau of Alcohol, Tobacco, Firearms & Explosives,*
   Civ. A. No. 20-1092 (TSC), 2022 WL 3355798 (D.D.C. Aug. 15, 2022) ...................... 14, 25

*Mead Data Ctr., Inc. v. Dep't of Air Force,*
   566 F.2d 242 (D.C. Cir. 1977) ................................................................. 24

*Media Rsch. Ctr. v. Dep't of Just.,*
   818 F. Supp. 2d 131 (D.D.C. 2011) ........................................................... 4

*Mobley v. CIA,*
   924 F. Supp. 2d 24 (D.D.C. 2013) ........................................................... 15

*Morley v. CIA,*
   508 F.3d 1108 (D.C. Cir. 2007) ................................................................. 4

*Multi Ag Media LLC v. Dep't of Agric.,*
   515 F.3d 1224 (D.C. Cir. 2008) ........................................................... 17, 22

*N.Y. Times Co. v. NASA,*
   782 F. Supp. 628 (D.D.C. 1991) ........................................................... 10, 13

iv

*N.Y. Times Co. v. NASA*,
   920 F.2d 1002 (D.C. Cir. 1990) ............................................................... 9

*Nat'l Archives & Recs. Admin. v. Favish*,
   541 U.S. 157 (2004) ................................................................ 10, 11, 17

*Nat'l Ass'n of Home Builders v. Norton*,
   309 F.3d 26 (D.C. Cir. 2002) ............................................................. 17, 22

\* *Nat'l Ass'n of Retired Fed. Emps. v. Horner*,
   879 F.2d 873 (D.C. Cir. 1989) ...................................................... 9, 11, 13

*Nat'l Cable Television Ass'n v. FCC*,
   479 F.2d 183 (D.C. Cir. 1973) ............................................................. 3-4

*Nat'l Sec. Couns. v. CIA*,
   206 F. Supp. 3d 241 (D.D.C. 2016) ...................................................... 4

*Nat'l Sec. News Serv. v. Dep't of Navy*,
   584 F. Supp. 2d 94 (D.D.C. 2008) ...................................................... 22

*Oglesby v. Dep't of Army*,
   920 F.3d 57 (D.C. Cir. 1990) ............................................................. 4

\* *Perioperative Servs. & Logistics, LLC v. Dep't of Veterans Affs.*,
   57 F.4th 1061 (D.C. Cir. 2023) ............................................ 5, 10, 12, 14, 24

*Pub. Emps. for Env't Resp. v. Dep't of Interior*,
   Civ. A. No. 06-0182 (CKK), 2006 WL 3422484 (D.D.C. Nov. 28, 2006) ............ 22

*Pub. Health & Med. Profs. for Transparency v. FDA*,
   Civ. A. No. 22-0915, 2023 WL 3335071 (N.D. Tex. May 9, 2023) ................ 11

*Reed v. NLRB*,
   927 F.2d 1249 (D.C. Cir. 1991) .......................................................... 7, 9

*Reliant Energy Power Generation, Inc. v. FERC*,
   520 F. Supp. 2d 194 (D.D.C. 2007) .................................................... 3

*Rural Hous. All. v. Dep't of Agric.*,
   498 F.2d 73 (D.C. Cir. 1974) ......................................................... 22, 25

*Ryan v. FBI*,
   174 F. Supp. 3d 486 (D.D.C. 2016) .................................................. 3, 4, 6

*Sussman v. U.S. Marshals Serv.*,
   494 F.3d 1106 (D.C. Cir. 2007) .......................................................... 5

*Tao v. Freeh*,
   27 F.3d 635 (D.C. Cir. 1994) ............................................................. 3

*United States v. Westinghouse Electric Corp.*,
  638 F.2d 570 (3d Cir. 1980) ................................................ 15

*Vaughn v. Rosen*,
  484 F.2d 820 (D.C. Cir. 1973) ............................................. 4

*Weisberg v. Dep't of Just.*,
  627 F.2d 365 (D.C. Cir. 1980) ............................................. 3

*Weisberg v. Dep't of Just.*,
  705 F.2d 1344 (D.C. Cir. 1983) ........................................... 3

*Whittaker v. Dep't of Just.*,
  Civ. A. No. 18-1434 (APM), 2020 WL 6075681 (D.D.C. Oct. 15, 2020) ............... 11

*Wolk Law Firm v. Nat'l Transp. Safety Bd.*,
  392 F. Supp. 3d 514 (E.D. Pa. June 18, 2019) ................................ 9-10

## Statutes

5 U.S.C. § 552 ............................................................ 1, 2, 4, 5, 6

21 U.S.C. § 360bbb-3 ...................................................... 18

42 U.S.C. § 300aa-10 ...................................................... 2

42 U.S.C. § 300aa-14 ...................................................... 2

42 U.S.C. § 300aa-25 ...................................................... 2

## Rules

Fed. R. Civ. P. 56 ........................................................ 3

## Regulations

21 C.F.R. § 20.21 ......................................................... 11

21 C.F.R. § 20.63 ......................................................... 2, 3, 6, 19, 21

21 C.F.R. § 600.80 ........................................................ 19

42 C.F.R. § 100.3 ......................................................... 2

45 C.F.R. § 5.24 .......................................................... 2, 3

## Secondary Sources

Charles Fried, *Privacy*,
  77 Yale L.J. 475, 483 (1968) ............................................. 15

Defendant, the United States Food and Drug Administration ("FDA"), respectfully submits this Memorandum of Points and Authorities in Support of its Motion for Summary Judgment.  This case stems from a request submitted by Plaintiff Informed Consent Action Network ("Plaintiff" or "ICAN") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for copies of autopsy reports concerning any Vaccine Adverse Event Reporting System ("VAERS" or "Reporting System") reported deaths following COVID-19 vaccination.  Declaration of Beth Brockner Ryan ("Brockner Ryan Decl.") ¶ 6; *see also* Pl.'s FOIA Request (ECF No. 1-1) at 8.  FDA collected all autopsy reports—a total of 539—associated with Reporting System reports that were submitted following the administration of a COVID-19 vaccine (the "Autopsy Reports").  Brockner Ryan Decl. ¶ 11.  After reviewing the Autopsy Reports, FDA determined that they were exempt from public disclosure under FOIA Exemption 6, because disclosure of the requested records would result in a clearly unwarranted invasion of personal privacy for the decedents' families.  5 U.S.C. § 552(b)(6).  FDA has satisfied its obligations under the FOIA and respectfully requests that this Court grant summary judgment in its favor.

## BACKGROUND

On November 29, 2021, Plaintiff submitted a FOIA request to FDA seeking "copies of autopsy reports concerning any VAERS-reported deaths following COVID-19 vaccination." Brockner Ryan Decl. ¶ 6; *see also* Pl.'s FOIA Request (ECF No. 1-1) at 8.  The Reporting System is "a national vaccine safety surveillance program co-[administered] by . . . the Centers for Disease Control and Prevention (CDC) and the Food and Drug Administration (FDA)."  *Long v. Dep't of Just.*, 778 F. Supp. 2d 222, 228 (N.D.N.Y. 2011); *see also* Declaration of Narayan Nair ("Nair Decl.") ¶ 7.  The Reporting System "is a post-marketing safety surveillance program" that collects "information about possible side effects that occur after the administration of vaccines licensed [or

authorized] for use in the United States," including the COVID-19 vaccines.[1] *Long*, 778 F. Supp. 2d at 228; *see also* Nair Decl. ¶ 7.

FDA denied Plaintiff's request in full initially on the grounds that the request sought records that were protected from disclosure by FOIA Exemptions 3 and 6, 5 U.S.C. §§ 552(b)(3), (b)(6). Specifically, FDA responded that the Autopsy Reports were exempt from disclosure under the National Childhood Vaccine Injury Act ("Vaccine Injury Act") of 1986, as amended, 42 U.S.C. §§ 300aa-10, *et seq.*,[2] as well as under FOIA Exemption 6, 5 U.S.C. § 552(b)(6), and 21 C.F.R. § 20.63, which exempt from public disclosure personnel, medical, and similar files where disclosure would result in a clearly unwarranted invasion of personal privacy. On October 7, 2022, Plaintiff appealed, challenging the adequacy of FDA's search and its assertion that Exemptions 3 and 6 justify withholding the Autopsy Reports in their entirety. Pl.'s Appeal (ECF No. 1-1) at 2. FDA in response advised that it needed to consult with the Centers for Disease Control and Prevention ("CDC"), as that agency had a substantial interest in the records subject to the appeal,

---

[1]     FDA, *Vaccine Adverse Events*, https://www.fda.gov/vaccines-blood-biologics/report-problem-center-biologics-evaluation-research/vaccine-adverse-events (last reviewed Jan. 27, 2021).

[2]     FDA is not at this time asserting Exemption 3, although FDA would assert Exemption 3 if the necessary predicate action occurs. Because COVID-19 vaccines are not currently included in the Vaccine Injury Table, *see* 42 C.F.R. § 100.3(a), reporting of deaths following the administration of COVID-19 vaccines is not mandated by Section 2125(c)(2) of the Vaccine Injury Act. *See* 42 U.S.C. § 300aa-25(c)(2). But if the Secretary of Health and Human Services adds COVID-19 vaccines to the Vaccine Injury Table, then reporting of alleged adverse events, including at least some deaths following administration of these vaccines, will likely be mandated by 42 U.S.C. § 300aa-25(b)(1). This can occur if (1) Congress enacts an excise tax on those vaccines, (2) CDC recommends them for routine administration to children or pregnant persons, and (3) the Secretary of the Health and Human Services publishes a notice of coverage in the Federal Register. *See* 42 C.F.R. §§ 100.3(a), (e)(8); *see also* 42 U.S.C. § 300aa-14(e). If COVID-19 vaccines are added to the Vaccine Injury Table, autopsy reports like those sought by Plaintiff would be exempt from disclosure under both FOIA Exemption 3, pursuant to 42 U.S.C. § 300aa-25(c), and FOIA Exemption 6. *See Long*, 778 F. Supp. 2d at 234–35 (finding that even if Exemption 3 is inapplicable to certain information submitted under the Reporting System, it would be exempt under Exemption 6); 42 U.S.C. § 300aa-25(c)(2).

and as a result, it might take longer than usual to process the appeal.  Compl. (ECF No. 1) ¶ 8.

Plaintiff filed this lawsuit six weeks later, alleging that FDA violated the FOIA by not making a

timely final determination on its appeal, failing to establish the adequacy of its search, and

improperly withholding responsive records.  *Id.* ¶¶ 10–19.

FDA filed its Answer (ECF No. 13) on January 17, 2023.  FDA now moves for summary

judgment because there are no genuine issues of material fact in this matter, and it is entitled to

entry of judgment in its favor as a matter of undisputed fact and law.

## LEGAL STANDARD

FOIA cases are typically decided on motions for summary judgment.  *Ryan v. FBI*, 174 F.

Supp. 3d 486, 490 (D.D.C. 2016), *summ. aff'd*, No. 16-5108, 2016 WL 6237841 (D.C. Cir. Sept.

16, 2016).  Summary judgment is granted when the "movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a), (c).  A fact is "material" when it "might affect the outcome of the suit under the governing

law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  An issue is "genuine"

if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson*, 477 U.S. at 248.

In the FOIA context, an agency is entitled to summary judgment if it "proves that it has

fully discharged its obligations" under FOIA.  *Reliant Energy Power Generation, Inc. v. FERC*,

520 F. Supp. 2d 194, 200 (D.D.C. 2007) (citing *Weisberg v. Dep't of Just.*, 705 F.2d 1344, 1350

(D.C. Cir. 1983)).  To do so, an agency must prove that each document responsive to the request(s)

has been produced, is unidentifiable, or is wholly exempt from disclosure.  *Weisberg v. Dep't of

Just.*, 627 F.2d 365, 368 (D.C. Cir. 1980) (quoting *Nat'l Cable Television Ass'n v. FCC*, 479 F.2d

183, 186 (D.C. Cir. 1973)).  The agency does not need to conduct a perfect search or search through every record in the system.  *Jud. Watch, Inc. v. Dep't of Treasury*, 248 F. Supp. 3d 87, 90 (D.D.C. 2017).  Summary judgment on the adequacy of the search is appropriate if the agency "show[s] beyond material doubt[ ] that it has conducted a search reasonably calculated to uncover all relevant documents," *Ryan*, 174 F. Supp. 3d at 490 (quoting *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007)), where "reasonableness" is established if the search includes all systems "that are likely to turn up the information requested," *id*. at 490–91 (quoting *Oglesby v. Dep't of Army*, 920 F.3d 57, 68 (D.C. Cir. 1990)).

If redacting or withholding records, the agency must prove that its claimed exemptions apply.  *Citizens for Resp. & Ethics in Wash. ("CREW") v. Dep't of Just.*, 746 F.3d 1082, 1088 (D.C. Cir. 2014) (citing *Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989)); *Elec. Frontier Found. v. Dep't of Just.*, 739 F.3d 1, 7 (D.C. Cir. 2014); 5 U.S.C. § 552(a)(4)(B).  To do so, the agency must submit evidence proving that it is "logical" or "plausible" that the invoked FOIA exemption(s) apply.  *Media Rsch. Ctr. v. Dep't of Just.*, 818 F. Supp. 2d 131, 137 (D.D.C. 2011) (citing *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).  An agency can meet this burden by submitting affidavits, declarations, a *Vaughn* index, or any combination of these methods.  *Nat'l Sec. Couns. v. CIA*, 206 F. Supp. 3d 241, 249 (D.D.C. 2016), *aff'd*, 969 F.3d 406 (D.C. Cir. 2020); *see also Vaughn v. Rosen*, 484 F.2d 820, 826–28 (D.C. Cir. 1973).  When relying on an affidavit or declaration, the evidence must "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and [that the evidence is] not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  *CREW*, 746 F.3d at 1088 (quoting *Larson*, 565 F.3d at 862).

For documents that contain both exempt and non-exempt material, the agency must disclose any non-exempt, responsive information that is reasonably segregable from exempt information in the record unless, after "deleting [or redacting] the exempt portions," the non-exempt portions are "inextricably intertwined with exempt portions." *Henderson v. Dep't of Just.*, 157 F. Supp. 3d 42, 51 (D.D.C. 2016) (citing 5 U.S.C. § 552(b)).  When an agency demonstrates that a record is exempt, it is "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material."  *Perioperative Servs. & Logistics, LLC v. Dep't of Veterans Affs.*, 57 F.4th 1061, 1068–69 (D.C. Cir. 2023) (alteration in original) (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007)).

## ARGUMENT

### I.   Plaintiff's Challenge to the Reasonableness of FDA's Search Is Without Merit Because FDA Collected All Autopsy Reports.

FDA is entitled to summary judgment regarding the adequacy of its search.  FDA collected all the autopsy reports associated with the Reporting System identification numbers identified by the CDC as having autopsy reports associated with adverse event reports submitted after the administration of a COVID-19 vaccine, a total of 539 autopsy reports.  *See* Brockner Ryan Decl. ¶ 11.  Because FDA did not have the capability to search itself, it asked the CDC to provide it with a list of identification numbers for all adverse event reports submitted to the Reporting System relating to deaths following the administration of a COVID-19 vaccine that were accompanied by an autopsy report.  *Id*. ¶ 9.  CDC provided FDA with the list of 595 identification numbers.  *Id*. ¶ 10.  Subject matter experts in FDA's Center for Biologics Evaluation and Research, Office of Biostatistics and Pharmacovigilance, then searched the Reporting System for each identification number on the list, collected all records associated with each identification number, and provided those records to the Division of Disclosure and Oversight Management within the Center for

Biologics Evaluation and Research, which is the division that processes FOIA requests for information relating to biological products.  *Id*. ¶¶ 2, 5, 11.  FDA ultimately identified 539 unique autopsy reports associated with the 595 identification numbers.  *Id.* ¶ 11.

Because FDA collected all autopsy reports associated with deaths that were reported after vaccination against COVID-19 to the Reporting System, which is the database identified by Plaintiff in its FOIA request, FDA satisfied the FOIA's mandate to conduct a "reasonable" search of all systems "that are likely to turn up the information requested."  *Ryan*, 174 F. Supp. 3d at 490–91.  Thus, there is no genuine dispute as to the adequacy of FDA's search for "copies of autopsy reports concerning any VAERS-reported deaths following COVID-19 vaccination."  Pl.'s FOIA Request (ECF No. 1-1) at 8.  Accordingly, the Court should find that FDA's search was adequate.

## II.   FDA Properly Withheld the Autopsy Reports Under Exemption 6.

### A.   The Requested Autopsy Reports Are "Medical Files" or "Similar Files" Covered by Exemption 6.

FOIA Exemption 6 protects "personnel and medical files and similar files" from public disclosure where release of such records "would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6); 21 C.F.R. § 20.63; *see also Henderson*, 157 F. Supp. 3d at 50.  To determine whether Exemption 6 applies, the court must first decide whether the records at issue are personnel, medical, or similar files.  If so, it engages in a balancing of the public's interest in learning what the government is up to against the personal privacy interests of individuals.  *Henderson*, 157 F. Supp. 3d at 50.

The first part of the Exemption 6 inquiry is meant to identify records in the government's possession that could be used to identify an individual, and the disclosure of which might result in injury or embarrassment to individuals discussed by those records.  *Id*.  To accomplish this goal,

Congress saw fit to protect "medical files" and "similar files," which the Supreme Court has interpreted to mean any records in the government's possession discussing "an individual which can be identified as applying to that individual," *Reed v. NLRB*, 927 F.2d 1249, 1250–51 (D.C. Cir. 1991) (quoting *Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 601–02 (1982)), even if those records do not encompass "'intimate details' and 'highly personal' information," *Wash. Post*, 456 U.S. at 600.   Exemption 6 has been asserted to protect information like a person's name, address, email address, date of birth, place of birth, employment history, criminal history, medical history, social security number, and telephone number.  *See Wash. Post*, 456 U.S. at 600; *Jud. Watch, Inc. v. Dep't of Navy*, 25 F. Supp. 3d 131, 141 (D.D.C. 2014); *see also Henson v. Dep't of Health & Human Serv.*, 892 F.3d 868, 878 (7th Cir. 2018); *Coleman v. Lappin*, 607 F. Supp. 2d 15, 22 (D.D.C. 2009).

Autopsies are specialized surgical procedures performed by doctors trained in the specialty of forensic pathology, and autopsy reports reflect those doctors' scientific judgments and professional opinions regarding an event that is unquestionably "medical" in nature.  *See* National Institutes of Health, *Forensic Autopsy*, https://www.ncbi.nlm.nih.gov/books/NBK539901/ (last updated Sept. 5, 2022); Slaughter Supply, *Autopsy 101: Post-Mortem Examination Information*, https://slaughtersupply.com/blogs/resources/autopsy-101-post-mortem-examination-guide (posted Dec. 4, 2019); MedicineNet, *Autopsy (Post Mortem Examination, Necropsy)*, https://www.medicinenet.com/autopsy/article.htm (last reviewed May 13, 2022).  Autopsy reports typically contain highly sensitive information about an individual's death, including the cause of death, mode of death, and manner of death; a description of the decedent's health before they died; information about the decedent's and family's medical histories; intimate details about the decedent's health and body including things like tattoos, piercings, and bodily features; the

examiner's judgments about whether any medical diagnosis was present but went unrecognized; and discussions about whether treatment was or should have been administered before death occurred.  *See* Declaration of John Hyder ("Hyder Decl.") ¶¶ 12–13.

When performing an autopsy, medical examiners often remove an individual's internal organs to establish their viability at the time of death.  *See* National Institutes of Health, *Forensic Autopsy*.  Autopsy reports memorialize the results of these evaluations and the medical examiners' professional opinions regarding whether lost functioning of any of these organs caused or contributed to an individual's death.  *See id.*  When a decedent received a COVID-19 vaccine shortly before death, the autopsy report contains a discussion about the conditions that led to death and whether the vaccine may have caused or contributed to those conditions, but they do not establish a causal link between the overall risk of death to the population and the particular COVID-19 vaccine administered to the individual.  Nair Decl. ¶ 15.  Autopsy reports also contain personal information such as the decedent's name, age, race, sex, date of birth, and date of death, which can be used to identify an individual and their next of kin.  Hyder Decl. ¶¶ 12–13.

As is apparent and indisputable, the "autopsy reports concerning any VAERS-reported deaths following COVID-19 vaccination" that Plaintiff seeks, Pl.'s FOIA Request (ECF No. 1-1) at 8, are "medical files" or "similar files" that may be withheld under FOIA Exemption 6 if their disclosure would result in a clearly unwarranted invasion of personal privacy.  *See Badhwar v. Dep't of Air Force*, 829 F.2d 182, 185–86 (D.C. Cir. 1987) (recognizing autopsy reports as a type of record that could be withheld under FOIA Exemption 6 and that some autopsy reports "clearly" should be withheld under Exemption 6).  The question for the Court is thus "whether disclosure of

the information in [the autopsy reports] would constitute a 'clearly unwarranted invasion of personal privacy.'" *Id.* at 186.

**B.      The Decedents' Surviving Family Members Have a Substantial Privacy Interest in Non-Disclosure of the Requested Autopsy Reports.**

The next step in determining whether the autopsy records are properly withheld under FOIA Exemption 6 is to identify the privacy interest in non-disclosure and the public interest in disclosure, and weigh those interests to determine "whether, on balance, disclosure would [result in] a clearly unwarranted invasion of personal privacy." *Reed*, 927 F.2d at 1251 (quoting *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989)). To properly withhold records under Exemption 6, an agency must establish that disclosure of the responsive records "would compromise a substantial, as opposed to a *de minimis*, privacy interest." *Horner*, 879 F.2d at 874.

*1.      Disclosure of the Autopsy Reports Will Result in Identifying Decedents and Their Surviving Family Members.*

Courts have recognized the substantial privacy interest that surviving family members have in the sensitive, graphic, and personal details of the circumstances surrounding a family member's death. *See, e.g.*, *N.Y. Times Co. v. NASA*, 920 F.2d 1002, 1010 (D.C. Cir. 1990) (remanding for the district court, under Exemption 6, "to determine whether any invasion of the astronauts' (or their families') privacy that the disclosure of the Challenger tape would cause is or is not 'clearly unwarranted' when compared to the 'citizens' right to be informed about what their government is up to'"); *Badhwar*, 829 F.2d at 185–86 (families of deceased aircraft pilots have privacy interests in autopsy reports which would be "of a kind that would shock the sensibilities of surviving kin," and remanding to determine whether disclosure of autopsy reports would be a "clearly unwarranted invasion of personal privacy" under Exemption 6); *Wolk Law Firm v. Nat'l Transp. Safety Bd.*, 392 F. Supp. 3d 514, 527 (E.D. Pa. June 18, 2019) ("The Court finds that the strong privacy

9

interests of the deceased and the relatives of the deceased are not outweighed by any public interest factors which are, at most, minimal. . . . Accordingly, the death scene photographs, autopsy reports, and medical case reviews were properly withheld under Exemption 6."); *N.Y. Times Co. v. NASA*, 782 F. Supp. 628, 631 (D.D.C. 1991) ("This Circuit has recognized Exemption 6 privacy interests of relatives in various records of deceased family members."); *cf. Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 166–69 (2004) (noting the interests of "survivor privacy" in death scene images pursuant to Exemption 7(C)).  As the Supreme Court stated in *Favish*, "[f]amily members have a personal stake in honoring and mourning their dead and objecting to unwarranted public exploitation" of the specifics of a loved one's death.  541 U.S. at 168.

Some records with information protected under Exemption 6 may be redacted to protect the identities of those being discussed in the records.  *Dep't of Air Force v. Rose*, 425 U.S. 352, 375–76 (1976) (personnel files such as "Health, Education, and Welfare files, Selective Service files, or Veterans' Administration files," "were nevertheless intended to be subject to mandatory disclosure in redacted form if privacy could be sufficiently protected").  Where, however, redactions will not sufficiently prevent the public from being able to the identify the individuals discussed in the records, and disclosure could result in a real threat of harassment, the records may be withheld in their entirety.  *See Perioperative Servs.*, 57 F.4th at 1068–69 (affirming withholding in full of record protected by Exemption 6).

Courts have held that the government can prove that surviving family members will be subject to a real threat of harassment by laying out a series of events that connect the act of disclosure to the resulting threat.  *See Climate Investigations Ctr. v. Dep't of Energy*, 331 F. Supp. 3d 1, 26 (D.D.C. 2018) ("An agency must provide affidavits containing 'reasonable specificity of detail rather than merely conclusory statements' to establish a substantial invasion of privacy.")

(quoting *Jud. Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013)); *see also*

*Horner*, 879 F.2d at 874; *cf. Favish*, 541 U.S. at 167–70 (specifically taking into account "the

consequences" of FOIA disclosure, including "public exploitation" of the records by either the

requester or others).  Known as the mosaic theory, it is well recognized that "separate disclosures

of otherwise innocuous information could be assembled by a requester or other person to reveal"

more sensitive information, including, as relevant here, the identities of the decedents discussed in

the autopsy reports and their next of kin, and intimate details about the decedents' physical, mental,

and behavioral health that relate to their death, including genetic disorders shared by surviving

family members.  *Whittaker v. Dep't of Just.*, Civ. A. No. 18-1434 (APM), 2020 WL 6075681,

at \*5 (D.D.C. Oct. 15, 2020).

Were FDA required to disclose redacted versions of the requested Autopsy Reports, it is

highly likely that Plaintiff or other members of the public[3] would be able to identify the decedents

discussed in the autopsy records by combining the information disclosed with information in the

public domain.  *See, e.g.*, *Forest Guardians v. Fed. Emergency Mgmt. Agency*, 410 F.3d 1214,

1220–21 (10th Cir. 2005) (holding that release of "electronic mapping files" would invade the

---

[3]        Pursuant to 21 C.F.R. § 20.21, any FDA record "that is disclosed in an authorized manner
to any member of the public is available for disclosure to all members of the public."  In a suit
brought by Public Health and Medical Professionals for Transparency, an organization that is
represented by Plaintiff's attorneys, that organization secured orders from the Court to compel
FDA's disclosure of the "documents it relied on to license Pfizer's COVID vaccine for 12- to
15-year-olds and Moderna's COVID vaccine" (i.e., documents not related to the ones sought in
this action).  *Pub. Health & Med. Profs. for Transparency v. FDA*, Civ. A. No. 22-0915, 2023 WL
3335071, at \*1 (N.D. Tex. May 9, 2023).  As FDA began disclosing these records, ICAN published
"[a]ll the Pfizer documents" on its website and noted that it "will continue to update that page as
more documents are produced."  *See* ICAN, *Breaking: ICAN's Attorneys Score Another Major
Win Against FDA with Pfizer and Moderna COVID-19 Vaccine Documents*, May 13, 2023,
https://icandecide.org/press-release/breaking-icans-attorneys-score-another-major-win-against-
fda-with-pfizer-and-moderna-covid-19-vaccine-documents/.

privacy interest of homeowners even though the invasion would occur only after "manipulat[ion]" of the square and lot numbers "to derive the addresses of policyholders and potential policyholders" because the files contained the specific locations of structures that "could easily lead to the discovery of an individual's name and home address" and subject them to "unwanted and unsolicited mail, if not more"); *Perioperative Servs.*, 57 F.4th at 1067–68 (acknowledging "unwanted contact following a FOIA disclosure" as an impingement on privacy interests that should be taken into account when balancing interests under Exemption 6) (quoting *ACLU v. Dep't of Just.*, 655 F.3d 1, 11 (D.C. Cir. 2011)); *see also* Hyder Decl. ¶¶ 11–20.

The requested Autopsy Reports contain several seemingly innocuous pieces of information that, if left unredacted, can be used to determine a decedent's identity. Such information includes, but is not limited to:

> tattoos, piercings, scars, or other unique identifiers on the body; information concerning any reported illness, disability, injury, or condition, including death; any symptom or manifestation of such illness, disability, injury, or condition, including those relating to death; name of medical examiner(s); location of the medical examiner(s); name(s) of the autopsy attendant(s); date of autopsy; time of autopsy; place of autopsy (state/locality); date of death; time of death; place of death; cause of death; manner of death; other conditions related to death; date the death certificate is issued; VAERS IDs associated with the autopsy reports; and the case numbers associated with the autopsy reports.

Hyder Decl. ¶ 12.  If FDA were compelled to disclose redacted versions of the requested Autopsy Reports, Plaintiff or other members of the public could use discrete pieces of information in the autopsy reports, like the ones discussed above, to identify the county (or city, town, or locale) in which the decedent died.  *Id.* ¶ 15.  With the correct locale in mind, Plaintiff or other members of the public could file requests with the appropriate local agencies for death certificates that reflect the cause, date, and place of death stated in the redacted autopsy reports.  *Id.* ¶ 16.

12

If Plaintiff or other members of the public had copies of all the death certificates that match these criteria, they could take the decedents' demographic information (i.e., age, sex, and race), "usual residence" (i.e., city or town), and information pertaining to the disposition of the decedents' bodies, including, if listed, the name and address of the cemetery or crematory and the name of the funeral director, and cross-reference obituaries published in area newspapers to narrow down, and ultimately identify, the decedents. *Id*. ¶ 17. Plaintiff or other members of the public could also cross-reference social media posts and profiles on Facebook, Instagram, and Ancestry.com, for example, to identify or verify the identities, hometowns, and common meeting places of decedents and their surviving family members. *Id*. ¶ 18. Social media accounts are a treasure trove of publicly available information that can be cross-referenced to identify an individual. *Id*. For example, identifying information can come from family photos, express references to "hometown" or "alma mater" in user profiles, publicly accessible versions of family trees, and any geotags or metadata associated with social media content. *Id*.

> 2. *Once Identified, Surviving Family Members Will Be Subject to Inquiries That Will Cause Additional Mental Anguish.*

Once identified, surviving family members are likely to be subject to "a barrage of mailings and personal solicitations[,] . . . a panoply of telephone calls from media groups as well as a disruption of their peace of mind every time" information from the Autopsy Reports is used to contact or solicit them. *N.Y. Times*, 782 F. Supp. at 632; *see also Horner*, 879 F.2d at 876 ("A non-embarrassing characteristic may or may not be otherwise significant, in a manner relevant to the individual's privacy interests, depending upon whether many parties in addition to the party making the initial FOIA request would be interested in obtaining a list of and contacting those who have that characteristic."). As a self-described member of the media, Plaintiff would be expected to develop and follow leads that enable it to disseminate information that advances its stated

13

mission.  *See* Pl.'s FOIA Request (ECF No. 1-1) at 8 ("ICAN is a not-for-profit news media organization whose mission is to raise public awareness about vaccine safety . . . . As part of its mission, ICAN actively investigates and disseminates information regarding vaccine safety issues . . . including through its website, a weekly health news and talk show, and through press events and releases.") (footnotes omitted).

Even if Plaintiff does not use the information to identify the decedents, others can once the information becomes publicly available, and they could well reach out to surviving family members for whatever purpose, whether or not related to COVID-19 vaccine safety issues.  Hyder Decl. ¶ 19.  Any inquiry, whether from the media or others, will cause the family members to be unwittingly exposed to the information in the records at issue through unwanted contact and publicity.  *See, e.g.*, *Perioperative Servs.*, 57 F.4th at 1067–68; *Forest Guardians*, 410 F.3d at 1220–21.  Contact of this kind will likely cause "additional pain, disruption to peace of mind, additional anguish, or annoyance or harassment" to surviving family members.  *McWatters v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, Civ. A. No. 20-1092 (TSC), 2022 WL 3355798, at *3 (D.D.C. Aug. 15, 2022) (Exemption 7(C)); *see, e.g.*, *Katz v. Nat'l Archives & Recs. Admin.*, 862 F. Supp. 476, 485 (D.D.C. 1994) (holding that autopsy X-rays and photographs of President Kennedy's assassination were properly withheld under Exemption 6 to avoid "additional anguish" to his family), *aff'd*, 68 F.3d 1438 (D.C. Cir. 1995).

Congress intended for the FOIA to protect these privacy interests.  *Marzen v. Dep't of Health & Human Servs.*, 825 F.2d 1148, 1152–53 (7th Cir. 1987) (noting that Congress envisioned 'privacy,' as it is understood under the FOIA, to extend beyond that recognized by the common

14

law).  As explained in *United States v. Westinghouse Electric Corp.*, 638 F.2d 570, 577 n.5 (3d

Cir. 1980):

> Privacy . . . is control over knowledge about oneself.  But it is not simply control
> over the quantity of information abroad; there are modulations in the quality of the
> knowledge as well.  We may not mind that a person knows a general fact about us,
> and yet feel our privacy invaded if he knows the details.  For instance, a casual
> acquaintance may comfortably know that I am sick, but it would violate my privacy
> if he knew the nature of the illness.  Or a good friend may know what particular
> illness I am suffering from, but it would violate my privacy if he were actually to
> witness my suffering from some symptom which he must know is associated with
> the disease.

*Id.* (quoting Charles Fried, *Privacy*, 77 Yale L.J. 475, 483 (1968)); *accord Marzen*, 825 F.2d

at 1152–53.  And as previously mentioned, this Court acknowledges that close relatives retain

privacy interests in information pertaining to deceased family members.  *Mobley v. CIA*, 924 F.

Supp. 2d 24, 70 (D.D.C. 2013) (granting summary judgment to FBI with respect to Exemptions 6

and 7(C) withholdings and reiterating that "the D.C. Circuit has repeatedly held that the close

relatives of a deceased person retain a certain amount of privacy interests after the decedent has

passed away") (collecting authorities).  Moreover, the courts of appeals have recognized the

substantial privacy interest surviving family members have in the autopsy reports of their loved

ones.  *See, e.g.*, *Badhwar*, 829 F.2d at 186 (noting that some autopsy reports might "shock the

sensibilities of surviving kin"); *Bowen v. FDA*, 925 F.2d 1225, 1228 (9th Cir. 1991) (affirming

withholding of autopsy reports of individuals killed by cyanide-contaminated products under

Exemption 6); *Marzen*, 825 F.2d at 1154 (deceased infant's medical records exempt from

disclosure under Exemption 6 because their release "would almost certainly cause . . . parents more

anguish").

In this case, disclosure of the Autopsy Reports would divulge "the nature of the

[decedents'] illness[es]," including highly sensitive information about comorbidities and

intervening or contributory causes of death like genetic disorders, chronic conditions, and substance abuse.  Hyder Decl. ¶ 13; *see also Bowen*, 925 F.2d at 1228 ("Exemption 6 is intended to protect 'individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information.'") (quoting *Wash. Post*, 456 U.S. at 599).  In areas of the country where decedents' communities are aware of the circumstances surrounding their death, and where community members know surviving family members, disclosure of the Autopsy Reports would give "neighbors, relatives, friends and co-workers" access to the "intimate details connected with the family's ordeal," especially where death was caused by sensitive conditions like the ones mentioned above.  *Marzen*, 825 F.2d at 1152.

There can be no question that surviving family members have a substantial privacy interest in the non-disclosure of their relatives' autopsy reports because disclosure, even of redacted versions of these reports, is insufficient to safeguard the decedents' identities and the identities of their next of kin.  Hyder Decl. ¶¶ 19–20.  And once identified, those familiar with the decedents and their surviving family members will know things about them that are deeply personal, "including information about genetic diseases, congenital disorders, chronic conditions, substance abuse, and mental illness."  *Id.* ¶¶ 12–13.  Additionally, inquiries from Plaintiff and other members of the media and public will force these families to reengage with the "details surrounding the circumstances of [their loved ones'] deaths" in a way that is readily understood to cause additional mental anguish.  *Id.* ¶ 13.  Thus, the privacy interests here are substantial.

**C.    Disclosure of the Autopsy Reports Is Unlikely to Advance Plaintiff's Asserted Public Interest.**

When there is a substantial privacy interest in non-disclosure of the requested records, as there is here, courts must determine whether the public interest in disclosure clearly outweighs individuals' privacy interests.  The only relevant public interest under the FOIA is the extent to

which disclosure "advances 'the citizens' right to be informed about what their government is up to.'" *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 34 (D.C. Cir. 2002) (quotation marks omitted) (quoting *Reps. Comm.*, 489 U.S. at 773). Accordingly, only "[o]fficial information that sheds light on an agency's performance of its statutory duties" may merit disclosure under FOIA. *Reps. Comm.*, 489 U.S. at 773.

Typically, requestors do not have to provide reasons for requesting information under the FOIA, but when disclosure implicates personal privacy interests, there must be a "nexus between the requested information and the asserted public interest that would be advanced by disclosure." *Favish*, 541 U.S. at 172–73; *see also Barnard v. Dep't of Homeland Sec.*, 598 F. Supp. 2d 1, 13 (D.D.C. 2009) ("Where, as here, the nexus between the information sought and the asserted public interest is lacking, the asserted public interests will not outweigh legitimate privacy interests [under Exemption 6]."). Agencies should not consider a requestor's identity or what it plans to use the information for when evaluating whether the requestor has asserted a valid public interest. *Consumers' Checkbook Ctr. for the Study of Servs. v. Dep't of Health & Human Servs.*, 554 F.3d 1046, 1051 (D.C. Cir. 2009); *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1231 n.2 (D.C. Cir. 2008) ("Although [the requestor] may not want the information to check up on the government itself, the use for which the requestor seeks the information is not relevant for purposes of determining the public interest under FOIA Exemption 6.").

According to Plaintiff, "the information in this FOIA request [will] allow it to contribute to the public understanding of the government's vaccine safety programs, including the government's efforts to promote vaccine safety." Pl.'s FOIA Request (ECF No. 1-1) at 8. Given "the significance of the largest public vaccination campaign of products under FDA's Emergency Use Authorization, and the subsequent Federal mandates requiring COVID-19 vaccination,"

Plaintiff claims that the "autopsy reports concerning any VAERS-reported deaths following COVID-19 vaccination would certainly weigh heavily in [the] public's interest in disclosure." Pl.'s Appeal (ECF No. 1-1) at 5.  As a "not-for-profit news media organization," Plaintiff also stated that its mission is "to raise public awareness about vaccine safety and to provide the public with information to give informed consent."  Pl.'s FOIA Request (ECF No. 1-1) at 8.

Plaintiff is wrong that disclosure of the VAERS autopsy reports at issue "will allow it to contribute to the public understanding of the government's vaccine safety programs, including the government's efforts to promote vaccine safety," because a Reporting System report alone cannot and does not establish a causal link between the overall risk of death and a COVID-19 vaccine. Nair Decl. ¶¶ 7, 14; *see also* FDA, *VAERS Overview*, https://www.fda.gov/vaccines-blood-biologics/vaccine-adverse-events/vaers-overview (last reviewed Aug. 12, 2021).  Nor do autopsy reports submitted to the Reporting System.  Nair Decl. ¶¶ 9, 10, 15.  To the contrary, disclosure of this information will cause unnecessary confusion to the public at large.  *See, e.g.*, *id.* ¶ 15 ("Autopsy reports submitted to VAERS cannot and do not establish a causal link between the overall risk of death to the population and the particular COVID-19 vaccine administered to the individual described by the autopsy report.").

Pursuant to the conditions of FDA's emergency use authorizations for COVID-19 vaccines, vaccination providers and manufacturers are required to submit a Reporting System report when the recipient presents with certain adverse events, even if the providers and manufacturers are not sure the vaccine was the cause of the adverse event.  *See* 21 U.S.C. § 360bbb-3; *see also* Nair Decl. ¶ 8; VAERS, *VAERS Data*, https://vaers.hhs.gov/data.html (last accessed July 13, 2023); VAERS, *Frequently Asked Questions (FAQs)*, https://vaers.hhs.gov/faq.html (last accessed July 13, 2023).  All vaccination providers must participate in the CDC

COVID-19 Vaccination Program, a government program to control storage, handling, and administration of COVID-19 vaccines in the United States.  Nair Decl. ¶ 8; *see also* CDC, *CDC COVID-19 Vaccination Program Provider Requirements and Support*, https://www.cdc.gov/vaccines/covid-19/vaccination-provider-support.html#provider-agreement (last reviewed May 23, 2023).  These providers must sign a CDC COVID-19 Vaccination Program Provider Agreement, which requires them to report these same adverse events for the licensed and authorized COVID-19 vaccines they administer.  Nair Decl. ¶ 8.  Licensed COVID-19 vaccine manufacturers must also report adverse events associated with use of the vaccine under 21 C.F.R. § 600.80, regardless of whether they consider the events to be related to the product.  Nair Decl. ¶ 8.

When an individual dies after receiving a COVID-19 vaccine, an autopsy report may be submitted to the Reporting System along with the adverse event report, or as a supplement to the adverse event report after the CDC contractor that administers the Reporting System requests it be submitted.  *Id*. ¶ 9.  The autopsy report may be conclusive as to that individual's cause of death, but even if the autopsy report concludes that a COVID-19 vaccine caused the death, it does not necessarily mean the COVID-19 vaccine presents an unrecognized or higher risk of death to the population at large.  *Id*. ¶ 10.  Accordingly, after the Office of Biostatistics and Pharmacovigilance receives an autopsy report from the Reporting System in which the individual received a COVID-19 vaccine prior to their death, it continues to evaluate other data so that it can identify patterns in the reporting and occurrence of adverse events following COVID-19 vaccination that merit further investigation.  *Id*. ¶ 11.

For example, experts in the Office of Biostatistics and Pharmacovigilance and at the CDC analyze the data submitted to the Reporting System and a number of other data sources, including but not limited to FDA's Biologics Effectiveness and Safety System, CDC's Vaccine Safety

Datalink, and the Clinical Immunization Safety Assessment project; they consult with their colleagues and experts at other agencies; and they engage in other methods of analytical review, such as manual review of individual files containing death reports, before they can conclude that a COVID-19 vaccine presents higher risk of death than is currently understood by experts and has been communicated to the general public.  *See* Nair Decl. ¶ 12.  Experts also rely on several analyses, like Empirical Bayesian and Proportional Reporting Ratio data mining and descriptive analysis and consult with colleagues, before recommending regulatory action to address a newly understood risk or an increase in the risk of an adverse event like death.  Nair Decl. ¶ 13; *see also* CDC, *Vaccine Adverse Event Reporting System (VAERS) Standard Operating Procedures for COVID-19 (as of February 2, 2022)*, https://www.cdc.gov/vaccinesafety/pdf/VAERS-COVID19-SOP-02-02-2022-508.pdf (last accessed July 13, 2023).  The Reporting System, its data, and the analyses of its data, including available autopsy reports, represent one piece of the Office of Biostatistics and Pharmacovigilance's overall assessment to determine whether a COVID-19 vaccine presents a higher risk of death to the population at large than is already understood by experts and has been communicated to the general public.  *See* Nair Decl. ¶ 14.

Notably, FDA collected 539 autopsy reports from the Reporting System, but the Reporting System currently contains more than 19,476 preliminary reports of death following the administration of COVID-19 vaccines.  *See* CDC, *Reported Adverse Events*, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/adverse-events.html (last updated May 31, 2023) ("More than 672 million doses of COVID-19 vaccines were administered in the United States from December 14, 2020, through March 1, 2023.  During this time, VAERS received 19,476 preliminary reports of death (0.0029%) among people who received a COVID-19 vaccine.").  The

Reporting System reports with an autopsy report represent approximately 2.8% of the total death reports in the database for deaths following COVID-19 vaccine administration. *See id.*

Even were autopsy reports alone sufficient to change FDA's calculus of the overall risk of death associated with COVID-19 vaccines, which they are not, the Autopsy Reports collected by FDA in response to Plaintiff's FOIA request represent a tiny fraction of the total preliminary reports of death made to the Reporting System following administration of a COVID-19 vaccine. But, as previously stated, autopsy reports do not prove an increase in the risk of death associated with any of the COVID-19 vaccines currently licensed or authorized in the United States. As a result, disclosure of the requested autopsy reports will not yield information of value to the public. *See, e.g.*, Nair Decl. ¶ 15. By themselves, autopsy reports are not enough to establish the health risk of COVID-19 vaccines, meaning they are an insufficient proxy to determine whether FDA is appropriately monitoring the reports made to the Reporting System and informing the public about the risk of death associated with COVID-19 vaccines. *Id.* ¶¶ 7, 10, 15. Thus, disclosure of the Autopsy Reports will not enable Plaintiff "to contribute to the public understanding of the government's vaccine safety programs, including the government's efforts to promote vaccine safety," Pl.'s FOIA Request (ECF No. 1-1) at 8, or more generally to the public's understanding of what the government is up to.

### D.    The Surviving Family Members' Privacy Interests in Non-Disclosure Outweigh the Public Interest in Disclosure of the Autopsy Reports.

If an agency identifies a substantial privacy interest in nondisclosure and a public interest in disclosure, the Court must weigh the two competing interests to determine whether disclosure of the information will result in a clearly unwarranted invasion of personal privacy. *Dep't of Def. v. Fed. Lab. Rels. Auth.*, 510 U.S. 487, 495 (1994). If the privacy interest in non-disclosure is

greater than the public interest in disclosure, the information can be withheld under Exemption 6; and the opposite is true as well. *Multi Ag*, 515 F.3d at 1229–30 (quoting *Norton*, 309 F.3d at 35).

To protect the privacy rights of innocent people, courts have found in favor of agencies seeking to withhold information when the requested information discusses personal, intimate details of an individual's life, including information pertaining to medical conditions and similar personal information. *Nat'l Sec. News Serv. v. Dep't of Navy*, 584 F. Supp. 2d 94, 97 (D.D.C. 2008) (upholding non-disclosure of hospital patient admission records under Exemption 6); *Pub. Emps. for Env't Resp. v. Dep't of Interior*, Civ. A. No. 06-0182 (CKK), 2006 WL 3422484, at *4 n.4 (D.D.C. Nov. 28, 2006) (noting that agency "appears to have properly invoked Exemption 6 in withholding [information] that 'detail[s] an employee's physical ailments and medical advice concerning those ailments'"). "The House Report on S. 1160, the bill which became the Freedom of Information Act, explains the broad purpose of [E]xemption 6": Congress intended "'[t]he limitation of a clearly unwarranted invasion of personal privacy [to] provide[ ] a proper balance between the protection of an individual's right of privacy and the preservation of the public's right to Government information by excluding those kinds of files the disclosure of which might harm the individual.'" *Rural Hous. All. v. Dep't of Agric.*, 498 F.2d 73, 77 n.13 (D.C. Cir. 1974) (quotation marks omitted) (quoting H.R. Rep. No. 1497, 89th Cong., 2d Sess. 11 (1966)). Congress also "intended [Exemption 6] to cover detailed Government records on an individual which can be identified as applying to that individual." *Id.*; *see also id.* at 75–77 (reversing lower court decision that Exemption 6 did not protect from disclosure a report on racial discrimination in the administration of government loans under the Rural Housing Program because it contained, as relevant to the Exemption 6 consideration, information about the loan applicants' medical conditions and alcohol consumption).

Courts have recognized situations where redacting identifying information is not adequate to protect the privacy of those being discussed by the records at issue. *See Carter v. Dep't of Com.*, 830 F.2d 388, 391 (D.C. Cir. 1987) ("Nonetheless, because court cases (and patents actually granted) are already in the public domain, release of certain portions of them, even with names redacted, could easily lead to the revelation of the documents in their entirety, including the identity of the attorneys involved. Therefore, disclosure of this information regarding court cases in response to a request for documents relating to disciplinary proceedings would likely identify these attorneys as easily as would the release of their addresses."). Similarly, the court in *Marzen* concluded that redacting identifying characteristics in an autopsy report was not enough to protect the privacy of an infant's surviving family members because the public would be able to ascertain the identity of the infant and "learn the intimate details connected with the family's ordeal." *Marzen*, 825 F.2d at 1152. Thus, the Seventh Circuit held that full withholding of the autopsy reports at issue was appropriate because disclosure "would undermine [the Department of Health and Human Services'] pledge to keep its records confidential." *Id.* at 1154.

Here, too, state and local public health agencies submitted autopsy reports to the Reporting System for individuals that received a COVID-19 vaccine prior to death with the understanding that the information in these reports would be kept confidential to the fullest extent of the law. *See* Nair Decl. ¶ 16; *see also* VAERS, *Frequently Asked Questions (FAQs)*, https://vaers.hhs.gov/faq.html (last accessed July 13, 2023) ("Patient identity is kept confidential. VAERS complies with all U.S. Government security standards and protections concerning health information."). Disclosure of the requested Autopsy Reports would undermine this understanding. *See* Nair Decl. ¶ 16 ("State and local public health agencies submitted autopsy reports to VAERS for individuals that received a COVID-19 vaccine prior to death with the understanding that the information in

these reports would be kept confidential to the fullest extent of the law.  Disclosure of the requested

VAERS autopsy reports would undermine this understanding.") (footnote omitted).  And such

disclosure could result in a "significant decline" in voluntary reporting of adverse events and

"significantly impact FDA's ability to engage in effective post-market safety surveillance of

COVID-19 vaccines going forward." *Id.*

 The Autopsy Reports present serious concerns.  As explained above, redacting the Autopsy

Reports will not be sufficient to protect the identities of the decedents and their next of kin.

*Perioperative Servs.*, 57 F.4th at 1068–69 ("When an agency demonstrates that a record is exempt,

as the [FDA] has done, it is 'entitled to a presumption that [it] complied with the obligation to

disclose reasonably segregable material.'").  In fact, FDA conducted a line-by-line review of a

representative sample of the Autopsy Reports and confirmed that the reports cannot be produced

in redacted form without harming the privacy interests of surviving family members.  Hyder Decl.

¶ 20; *Perioperative Servs.*, 57 F.4th at 1068–69 (an agency is not required to disclose redacted

versions of records when the necessary redactions would be so substantial that "the unredacted

markings would 'have minimal or no information content.'") (quoting *Mead Data Ctr., Inc. v.

Dep't of Air Force*, 566 F.2d 242, 261 n.55 (D.C. Cir. 1977)).  Once any information in the

requested Autopsy Reports is disclosed, Plaintiff and other members of the public can use this

information to conduct additional, more targeted searches for records maintained by county

agencies, local newspapers, other geographically distinct recordkeepers, and digital databases

(including social media accounts), and cull the information it extracts from these records to

uncover a decedent's identity.  Hyder Decl. ¶¶ 15–18.  Once the subject of a particular autopsy

report is identified, it will be easy to identify, locate, and contact the decedent's surviving family

members who may otherwise prefer to remain undisturbed.  *Id.* ¶¶ 18–20; *see also Perioperative*, 57 F.4th at 1067–68.

By itself, identification of the decedents and their family members would suffice as a clearly unwarranted invasion of personal privacy.  *See Rural Hous. All.*, 498 F.2d at 77 n.13 (noting that Congress also "intended [Exemption 6] to cover detailed Government records on an individual which can be identified as applying to that individual") (quoting H.R. Rep. No. 1497, 89th Cong., 2d Sess. 11 (1966)).  Furthermore, the government should not generally be in the business of publicizing details about a decedent's body, medical diagnoses, or mental health, or the genetic predispositions and disorders shared by decedents and their surviving family members.  *See* Hyder Decl. ¶ 13.  Moreover, the highly politicized issue of vaccine safety can also lead to untoward efforts by Plaintiff or other members of the public to contact surviving family members, who may have their own strong feelings about COVID-19 vaccines, to extract information and exploit the loss of loved ones to their own ends.  Pl.'s FOIA Request (ECF No. 1-1) at 8.  These efforts, and subsequent contacts made by other members of the media or public, will force surviving family members to endure "additional pain, disruption to peace of mind, additional anguish, or annoyance or harassment."  *McWatters*, 2022 WL 3355798, at *3.  That is precisely what Congress was trying to prevent when it enacted the FOIA and Exemption 6.  *See Rural Hous. All.*, 498 F.2d at 77 n.13; *see also Marzen*, 825 F.2d at 1154 (finding a deceased infant's medical records exempt because their release "would almost certainly cause . . . parents more anguish").

The public's interest in disclosure of the Autopsy Reports does not clearly outweigh the decedents' families' privacy interests in withholding these records.  Plaintiff claims that the information will allow it to report the actual risk of death associated with COVID-19 vaccines, but death reports in the Reporting System are all preliminary, and these autopsy reports do not assist

in establishing the risk of death to the population at large.  Nair Decl. ¶¶ 7, 10, 15.  To establish the risk of death, FDA evaluates reams of data from many cases to see if there is a pattern of death events occurring after the administration of a COVID-19 vaccine.  *Id*. ¶¶ 11–13.  Therefore, Plaintiff seeks records that fail to advance its ability "to contribute to the public understanding of the government's vaccine safety programs."  Pl.'s FOIA Request (ECF No. 1-1) at 8.

Meanwhile, decedents and their surviving family members have substantial privacy interests in these reports because they contain information that describes an exceedingly sensitive moment in life: the death of a loved one.  In addition to containing sensitive, personal information about the decedents, the autopsy reports at issue may also include highly sensitive and potentially embarrassing information relating to the circumstances surrounding or resulting in a decedent's death, including but not limited to substance abuse, severe mental illness, and suicide, and information that relates directly to surviving family members, such as genetic disorders.  *See* Hyder Decl. ¶¶ 12–13.  For surviving family members, the depth and spectrum of emotions that can be associated with a loved one's death and information relating to it are both profound and protracted. That is why Exemption 6 protects these interests: because it respects the sanctity of the dead and the ones they have left behind.  *See id.* ¶¶ 19–20.  The surviving family members' privacy interests in non-disclosure of the Autopsy Reports far outweigh the public's interest in disclosure of these reports.  Thus, the Autopsy Reports should be withheld in full under FOIA Exemption 6.

\*     \*     \*

Plaintiff is well aware of how important it is to maintain the privacy of such personal health information and frequently trumpets the importance of these privacy interests.  *See, e.g.*, ICAN, *ICAN Sends Legal Demand to Michigan About Its Illegal Privacy Violations Related to Vaccine Exemptions*, June 12, 2023,  https://icandecide.org/press-release/ican-sends-legal-demand-to-

michigan-about-its-illegal-privacy-violations-related-to-vaccine-exemptions/ ("ICAN's attorneys point out that, in clear violation of privacy laws, [the Michigan Department of Health and Human Services] is permitting local health departments to store confidential information in the state's vaccine registry.  In addition, local health departments are permitted to create electronic health records for families who claim a nonmedical vaccine exemption, thereby capturing and storing private information that they are not entitled to collect.  To add insult to injury, the local health departments don't disclose to parents that they are creating these records or inputting them into the state's tracking system."); ICAN, *First, the Government Played Doctor.  Now It Wants to Play God!*, Apr. 25, 2022, https://icandecide.org/press-release/first-the-government-played-doctor-now-it-wants-to-play-god/ ("Well, the Constitution has just taken another hit, and we're mobilizing again to defend it.  The reason is that our infernal authorities, not content with demanding to know your medical status, now want unfettered access to your religious status too!"). Plaintiff believes it is wrong for "our infernal authorities" to have access to our private medical information, *supra*, but surely it is much worse for the government to hand that information over to the public.  Yet, without acknowledging its own inconsistency, Plaintiff asks this Court to do just that.  Consistent with the great weight of authority and the respect owed to the dead and their families, the Court should protect the substantial privacy interests that Plaintiff otherwise recognizes.

*       *       *

27

## CONCLUSION

For the reasons discussed above, FDA conducted a reasonable search for records responsive to Plaintiff's FOIA request and properly withheld the Autopsy Reports in their entirety under FOIA Exemption 6. For all of the foregoing reasons, FDA respectfully requests that its motion for summary judgment be granted.

Dated: July 13, 2023

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar No. 481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By:     /s/ *Douglas C. Dreier*
DOUGLAS C. DREIER, D.C. Bar No. 1020234
Assistant United States Attorney – Civil Division
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C.  20530
(202) 252-2551
douglas.dreier@usdoj.gov

*Counsel for the United States of America*

Of counsel:

SAMUEL BAGENSTOS
General Counsel
Dep't of Health and Human Services

MARK RAZA
Chief Counsel

WENDY VICENTE
Deputy Chief Counsel, Litigation

JOSHUA M. FREDA
Associate Chief Counsel
Office of the General Counsel
U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993