UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

INFORMED CONSENT ACTION
NETWORK,

          Plaintiff,

     v.                                           Civil Action No. 22-3572 (CKK)

FOOD AND DRUG ADMINISTRATION,

          Defendant.

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND REPLY IN SUPPORT OF ITS
<u>MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

ARGUMENT ................................................................................................................. 1

I.   In a FOIA Action, Review Is Based on the Summary Judgment Papers, Not the
Administrative Record ................................................................................................... 1

II.  Plaintiff Concedes That FDA Conducted an Adequate Search. ............................................ 2

III. The Autopsy Reports Are Subject to Exemption 6 ............................................................. 3

   A.   The Autopsy Reports Qualify As "Medical Files" and "Similar Files" Eligible for
   Withholding Under Exemption 6. ................................................................................. 3

   B.   Release of the Autopsy Reports Would Constitute a Clearly Unwarranted Invasion of
   Personal Privacy. ....................................................................................................... 5

      1.   The Decedents' Surviving Family Members Have a Substantial Privacy Interest in
      Non-Disclosure of the Autopsy Reports. .................................................................. 5

      2.   Disclosure of the Autopsy Reports Will Not Enable Plaintiff to Contribute to the
      Public's Understanding of COVID-19 Vaccine Safety. ............................................. 14

      3.   The Public Interest in Disclosure of the Autopsy Reports Does Not Outweigh
      Surviving Family Members' Privacy Interests in Non-Disclosure. .................................. 17

   C.   To the Extent the Autopsy Reports Contain Non-Exempt, Responsive Information, It Is
   Not Reasonably Segregable from Information Protected by Exemption 6. ........................... 19

CONCLUSION ........................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*ACLU v. Dep't of Just.*,
  655 F.3d 1 (D.C. Cir. 2011) ............................................................... 5, 8

\* *Badhwar v. Dep't of Air Force*,
  829 F.2d 182 (D.C. Cir. 1987) ..................................................... 3, 4, 6, 7

*Barnard v. Dep't of Homeland Sec.*,
  598 F. Supp. 2d 1 (D.D.C. 2009) ........................................................ 17

*Bowen v. FDA*,
  925 F.2d 1225 (9th Cir. 1991) ...................................................... 13, 18

*Consumers' Checkbook Ctr. for the Study of Servs. v. Dep't of Health & Hum. Servs.*,
  554 F.3d 1046 (D.C. Cir. 2009) ............................................................ 5

*Covington v. McLeod*,
  No. 09-5336, 2010 WL 2930022 (D.C. Cir. July 18, 2010) (per curiam) ............ 21

*Dep't of Def. v. Fed. Lab. Rels. Auth.*,
  510 U.S. 487 (1994) ........................................................................ 11

*Dep't of State v. Wash. Post Co.*,
  456 U.S. 595 (1982) ............................................................... 3, 4, 13

*Esch v. Yeutter*,
  876 F.2d 976 (D.C. Cir. 1989) ............................................................. 1

*Forest Guardians v. Fed. Emerg. Mgmt. Agency*,
  410 F.3d 1214 (10th Cir. 2005) ....................................................... 8, 19

*Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*,
  524 F.3d 1021 (9th Cir. 2008) ...................................................... 16, 17

*Ground Saucer Watch, Inc. v. CIA*,
  692 F2d 770 (D.C. Cir. 1981) ............................................................ 19

*Henderson v. Dep't of Just.*,
  157 F. Supp. 3d 42 (D.D.C. 2016) ....................................................... 3

*Jordan v. Dep't of Labor*,
  273 F. Supp. 3d 214 (D.D.C. 2017) .................................................... 1-2

*Jud. Watch, Inc. v. Food & Drug Admin.*,
  449 F.3d 141 (D.C. Cir. 2006) .......................................................... 21

*Katz v. Nat'l Archives & Records Admin.*,
  862 F. Supp. 476 (D.D.C. 1994) ..................................................... 5, 6, 7

*Larson v. Dep't of State*,
    565 F.3d 857 (D.C. Cir. 2009) ........................................................................ 1

*Lesar v. Dep't of Just.*,
    636 F.2d 472 (D.C. Cir. 1980) ........................................................................ 8

*Long v. Dep't of Just.*,
    778 F. Supp. 2d 222 (N.D.N.Y. 2011) ........................................................... 2

*Marzen v. Dep't of Health & Hum. Servs.*,
    825 F.2d 1148 (7th Cir. 1987) ............................................................... 10, 13

*Mays v. Drug Enf't Admin.*,
    234 F.3d 1324 (D.C. Cir. 2000) ................................................................ 21-22

*McWatters v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
    Civ. A. No. 20-1092 (TSC), 2022 WL 3355798 (D.D.C. Aug. 15, 2022) ...................... 13, 18

*Mead Data Ctr., Inc. v. Dep't of Air Force*,
    566 F.2d 242 (D.C. Cir. 1977) ...................................................................... 21

*Miller v. Casey*,
    730 F.2d 773 (D.C. Cir. 1984) ........................................................................ 1

*Multi Ag Media LLC v. Dep't of Agric.*,
    515 F.3d 1224 (D.C. Cir. 2008) ...................................................................... 6

*N.Y. Times Co. v. Nat'l Aeronautics & Space Admin.*,
    920 F.2d 1002 (D.C. Cir. 1990) (en banc) ...................................................... 4

*N.Y. Times Co. v. Nat'l Aeronautics & Space Admin.*,
    782 F. Supp. 628 (D.D.C. 1991) ................................................................... 20

*Nat'l Ass'n of Retired Fed. Emps. v. Horner*,
    879 F.2d 873 (D.C. Cir. 1989) ............................................................... 13, 14

*North v. Dep't of Just.*,
    892 F. Supp. 2d 297 (D.D.C. 2012) ............................................................... 2

*Off. of the Cap. Collateral Couns. v. Dep't of Just.*,
    331 F.3d 799 (11th Cir. 2003) ..................................................................... 16

\* *Perioperative Servs. & Logistics, LLC v. Dep't of Veterans Affs.*,
    57 F.4th 1061 (D.C. Cir. 2023) ..................................................... 5, 8, 10, 21

*Reed v. NLRB*,
    927 F.2d 1249 (D.C. Cir. 1991) .............................................................. 3, 14

*Reps. Comm. for Freedom of the Press v. Dep't of Just.*,
    3 F.4th 350 (D.C. Cir. 2021) ....................................................................... 21

i

*Rural Hous. All. v. Dep't of Agric.*,
  498 F.2d 73 (D.C. Cir. 1974) ........................................................................ 18, 20

*SafeCard Servs., Inc. v. SEC*,
  926 F.2d 1197 (D.C. Cir. 1991) .......................................................................... 19

*Schoenman v. FBI*,
  604 F. Supp. 2d 174 (D.D.C. 2009) ...................................................................... 2

\*  *Telematch, Inc. v. Dep't of Agric.*,
  45 F.4th 343 (D.C. Cir. 2022) ........................................................... 4-5, 6, 7, 8, 14

*Tobey v. NLRB*,
  40 F.3d 469 (D.C. Cir. 1994) ............................................................................... 4

*Whittaker v. Dep't of Just.*,
  Civ. A. No. 18-1434 (APM), 2020 WL 6075681 (D.D.C. Oct. 15, 2020) ...................... 10, 11

*Wolf v. CIA*,
  473 F.3d 370 (D.C. Cir. 2007) .............................................................................. 1

**Statutes**

5 U.S.C. § 552 .................................................................................................. 3, 5

**Regulations**

21 C.F.R. Part 20 ................................................................................................ 20

21 C.F.R. § 20.63 ................................................................................................. 3

Defendant, the United States Food and Drug Administration ("FDA"), respectfully submits this reply in support of its motion for summary judgment and opposition to Plaintiff's cross-motion for summary judgment.

## ARGUMENT

The Court should grant FDA's motion for summary judgment and deny Plaintiff's cross-motion.  FDA has "describe[d] the justifications for nondisclosure with reasonably specific detail [and] demonstrate[d] that the information withheld logically falls within the claimed exemption," and the agency's justifications are "not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)).  As the D.C. Circuit has noted, "an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible."  *Miller*, 730 F.2d at 776 (internal quotation marks omitted; quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007)).  FDA has fully supported its assertion of FOIA Exemption 6 to withhold the Autopsy Reports.

I.      **In a FOIA Action, Review Is Based on the Summary Judgment Papers, Not the Administrative Record.**

Although not germane to the argument section of Plaintiff's brief, Defendant notes that Plaintiff's standard of review section cites a non-FOIA action for the principle that, in cases involving review of an administrative record, courts generally limit their review to information contained within the administrative record.  Pl.'s Br. (ECF No. 22-1) at 6–7 (citing *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989)); *see also Esch*, 876 F.2d at 977 (noting that plaintiffs challenged "a decision by the Department of Agriculture to partially suspend their participation in two federal farm subsidy programs").  Judicial review of a FOIA action is not limited to the administrative record.  *See Jordan v. Dep't of Labor*, 273 F. Supp. 3d 214, 239 (D.D.C. 2017)

("[T]he Court is not to review the basis for withholding provided by the agency at the administrative level."); *North v. Dep't of Just.*, 892 F. Supp. 2d 297, 301 (D.D.C. 2012) (Kollar-Kotelly, J.) ("The relevant record from which the Court must [make its determination] is the *summary judgment* record, not the administrative record relating to the Plaintiff's underlying FOIA requests.") (emphasis in original).[1]    Accordingly, the Court should assess the summary judgment record.

## II.    <u>Plaintiff Concedes That FDA Conducted an Adequate Search.</u>

In its opposition and cross-motion (ECF No. 22), Plaintiff does not challenge the adequacy of FDA's search for autopsy reports submitted to the Vaccine Adverse Events Reporting System ("VAERS" or the "Reporting System") following vaccination against COVID-19.[2]    *See* Pl.'s Br. (ECF No. 22-1) at 5 n.3 ("ICAN does not assert a challenge to the adequacy of the search[.]"). Instead, Plaintiff limits its challenge to the adequacy of FDA's grounds for withholding these reports under FOIA Exemption 6.  *Id.* at 7.  Thus, Plaintiff concedes that issue, and the only issue for the Court to decide is whether FDA has properly supported its Exemption 6 withholdings.  *See Schoenman v. FBI*, 604 F. Supp. 2d 174, 204 (D.D.C. 2009) (Kollar-Kotelly, J.) ("Plaintiff has not responded to this argument in either his Cross-Motion for Partial Summary Judgment or his Reply, nor has Plaintiff otherwise disputed the adequacy of the FBI's search.  Plaintiff has therefore conceded the issue.") (citation omitted).

---

[1]    Thus, because FDA did not assert Exemption 3 in its brief, the Court is not asked to opine on Exemption 3.  *See* Def.'s Br. (ECF No. 21-1) at 8 n.2.

[2]    The Vaccine Adverse Event Reporting System is "a national vaccine safety surveillance program co-[administered] by . . . the Centers for Disease Control and Prevention (CDC) and the Food and Drug Administration (FDA)" that collects "information about possible side effects that occur after the administration of vaccines licensed [or authorized] for use in the United States." *Long v. Dep't of Just.*, 778 F. Supp. 2d 222, 228 (N.D.N.Y. 2011); *see also* Declaration of Narayan Nair ("Nair Decl.") (ECF No. 21-5) ¶ 7.

III.   **The Autopsy Reports Are Subject to Exemption 6.**

FOIA Exemption 6 protects from disclosure "personnel and medical files and similar files" where the release of such records "would constitute a clearly unwarranted invasion of personal privacy."   5 U.S.C. § 552(b)(6); 21 C.F.R. § 20.63.   This exemption shields records in the government's possession that could be used to identify an individual, including persons not discussed directly by information in these records when disclosure might result in injury or embarrassment to these individuals.   *Henderson v. Dep't of Just.*, 157 F. Supp. 3d 42, 50 (D.D.C. 2016).   Although much of Plaintiff's argument is directed towards segregability, Plaintiff also argues that the Autopsy Reports do not satisfy the Exemption 6 threshold, do not implicate any privacy interest whatsoever, and are a matter of great public interest.   FDA addresses each of these arguments in turn.

A.   **The Autopsy Reports Qualify As "Medical Files" and "Similar Files" Eligible for Withholding Under Exemption 6.**

Congress enacted protections for "personnel and medical files and similar files," which the Supreme Court interprets as any records in the government's possession that discuss "an individual . . . [and] can be identified as applying to that individual," *Reed v. NLRB*, 927 F.2d 1249, 1250–51 (D.C. Cir. 1991) (quoting *Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 600–02 (1982)), even if those records do not contain "'intimate details' [or] 'highly personal' information.'" *Wash. Post*, 456 U.S. at 600.   Relying on *Badhwar v. Department of Air Force*, 829 F.2d 182 (D.C. Cir. 1987), Plaintiff perfunctorily attempts to refute FDA's argument that the Autopsy Reports are "medical files" or "similar files" eligible for withholding under FOIA Exemption 6.   Plaintiff's reading of *Badhwar* is incorrect.

No reading of *Badhwar* implies that autopsy reports are only "medical files" or "similar files" in certain instances.   *See Badhwar*, 829 F.2d at 185–86.   The issue in *Badhwar* was that the

District Court "may have overlooked" the government's Exemption 6 argument entirely, addressing only Exemption 5. *Id.* at 185.  The Court noted that, on remand, the District Court would need to assess whether release of the autopsy report "would constitute a 'clearly unwarranted invasion of personal privacy.'" *Id.* at 186.  For that "clearly unwarranted invasion of personal privacy" analysis, "a case-by-case evaluation" was required.  That evaluation, however, occurs only if the predicate fact for Exemption 6—i.e., that the records are "medical files" or "similar files"—is already established.  *See Wash. Post*, 456 U.S. at 602 n.4 (identifying Exemption 6's "threshold requirement that information be contained in personnel, medical, and similar files"); *Telematch, Inc. v. Dep't of Agric.*, 45 F.4th 343, 351 (D.C. Cir. 2022) (distinguishing between the first condition of the Exemption 6 test and the second condition).

*Badhwar* does not imply that certain autopsy reports are not "medical files" or "similar files," nor do courts approve of such a narrow reading of the "similar files" standard.  *See Wash. Post*, 456 U.S. at 600 (explaining that, for Exemption 6, "the phrase 'similar files' was to have a broad, rather than a narrow, meaning").  "Echoing the United States Supreme Court, [the D.C. Circuit has] characterized the threshold test for what constitutes 'similar files' under exemption 6 as a 'minimal' one, requiring only that they contain 'information which applies to a particular individual.'" *Tobey v. NLRB*, 40 F.3d 469, 472 (D.C. Cir. 1994) (quoting *N.Y. Times Co. v. Nat'l Aeronautics & Space Admin.*, 920 F.2d 1002, 1004–05 (D.C. Cir. 1990) (en banc)).  Autopsy reports of decedents certainly contain information applying to a particular individual, *see, e.g.*, Hyder Decl. (ECF No. 21-4) ¶ 12; therefore, they satisfy the Exemption 6 threshold and are eligible for withholding under this exemption.

**B.      Release of the Autopsy Reports Would Constitute a Clearly Unwarranted Invasion of Personal Privacy.**

Once the Exemption 6 threshold is met, the next question for the Court is whether disclosure "would constitute a clearly unwarranted invasion of personal privacy." *Telematch*, 45 F.4th at 351 (quoting 5 U.S.C. § 552(b)(6)).  "To determine whether [this] condition is met, we first ask 'whether disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest.'"  *Id.* (quoting *Consumers' Checkbook Ctr. for the Study of Servs. v. Dep't of Health & Hum. Servs.*, 554 F.3d 1046, 1050 (D.C. Cir. 2009)).  "If so, we 'balance the privacy interest in non-disclosure against the public interest.'"  *Id.* (quoting *Consumers' Checkbook*, 554 F.3d at 1050).  Here, Plaintiff urges that there is no privacy interest at all in the non-disclosure of the Autopsy Reports.  Pl.'s Br. (ECF No. 22-1) at 9.  But Plaintiff is mistaken.

> 1.      *The Decedents' Surviving Family Members Have a Substantial Privacy Interest in Non-Disclosure of the Autopsy Reports.*

The D.C. Circuit has "recognized a substantial privacy interest in avoiding 'unwanted contact following a FOIA disclosure.'"  *Perioperative Servs. & Logistics, LLC v. Dep't of Veterans Affs.*, 57 F.4th 1061, 1067 (D.C. Cir. 2023) (quoting *ACLU v. Dep't of Just.*, 655 F.3d 1, 11 (D.C. Cir. 2011)); *see also ACLU*, 655 F.3d at 11 (collecting cases).  FDA's declarations demonstrate a reasonably foreseeable risk that release of even redacted versions of the Autopsy Reports would result in unwanted contact.  *See, e.g.*, Hyder Decl. (ECF No. 21-4) ¶ 19 ("It is reasonably foreseeable that FDA's public disclosure of redacted versions of the requested VAERS autopsy reports would harm surviving family members because Plaintiff or any member of the public can combine the information it receives with information in the public domain to identify the decedents and their next of kin.").  Accordingly, surviving family members have a substantial privacy interest in non-disclosure of the Autopsy Reports.

Relying on *Badhwar* and *Katz v. National Archives & Records Admin.*, 862 F. Supp. 476 (D.D.C. 1994)—a District Court decision granting summary judgment to an agency because it properly withheld autopsy photographs in full—Plaintiff rejects longstanding Exemption 6 jurisprudence and instead requires disclosure to "'shock the sensibilities' of or 'cause extreme anguish' to the decedent's surviving kin" before a record is capable of implicating a substantial privacy interest.  Pl.'s Br. (ECF No. 22-1) at 9 (quoting, first, *Badhwar*, 829 F.2d at 185–86, and, second, *Katz*, 862 F. Supp. at 483–86).  But that is not the test for whether a record implicates a substantial privacy interest.  *See, e.g.*, *Telematch*, 45 F.4th at 351 ("The release of customer numbers would impair a substantial privacy interest.  USDA uses customer numbers in records on land sales, business relationships, crops planted, and the programs in which owners are participating.  As we recognized even in the context of farm and tract numbers, the release of such information would 'allow for an inference to be drawn about the financial situation of an individual farmer,' which implicates a substantial privacy interest.") (quoting *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1228 (D.C. Cir. 2008)); *Multi Ag*, 515 F.3d at 1229–30 ("Our use of the word substantial in this context means less than it might seem.  A substantial privacy interest is anything greater than a *de minimis* privacy interest.").

In *Badhwar*, the D.C. Circuit did not determine whether any autopsy reports implicated a substantial privacy interest.  *Badhwar*, 829 F.2d at 185–86.  Indeed, the phrase "privacy interest" does not appear in the Court's opinion.  The Court merely remanded the case so that the District Court could determine in the first instance "whether disclosure of the information . . . would constitute a 'clearly unwarranted invasion of personal privacy.'"  *Id.* at 186.  The Court noted that "[a]n Exemption 6 claim requires a case-by-case evaluation," which is true of all Exemption 6 cases and is not specific to autopsy reports.  *Id.* at 185.  The Court then stated that "[s]ome autopsy

reports, presumably, would not be of a kind that would shock the sensibilities[3] of surviving kin[;] [o]thers clearly would." *Id.* at 185–86.  The Court's remark cannot be read to indicate that a substantial privacy interest exists only when release of an autopsy report shocks the sensibilities of surviving kin.  Rather, it served as a directive for the District Court to conduct the Exemption 6 balancing test.  *See id.*

Similarly, in *Katz*, the phrase "extreme anguish" appears only once, in the words of a declarant who noted that release of the autopsy photographs would cause extreme anguish to surviving family members.  *Katz*, 862 F. Supp. at 484 (quoting declaration).  The plaintiff in that case did not dispute that the surviving family members had a privacy interest, *id.* at 483, and the Court indeed "f[ound] that the [ ] family has a clear privacy interest in preventing the disclosure" of the autopsy photographs, *id.* at 485.  *Katz* does not in any way imply that surviving family members have a substantial privacy interest only if disclosure of the autopsy reports would cause extreme anguish.  *See id.* at 483–86.  Nor, for that matter, does *Katz* espouse Plaintiff's alternative "shock the sensibilities" test.  *See id.*  Again, if the release of Department of Agriculture customer numbers "implicates a substantial privacy interest," which it does, *Telematch*, 45 F.4th at 351, then "extreme anguish" cannot be the test.

Here, FDA has provided a detailed description of the substantial privacy interest implicated by the Autopsy Reports.  *See* Hyder Decl. (ECF No. 21-4) ¶¶ 11–20.  Plaintiff is wrong to minimize

---

[3]     Although neither "shock the sensibilities" nor "extreme anguish" is the relevant test, FDA urges that disclosure of the Autopsy Reports would indeed shock the sensibilities and cause extreme anguish.  Perhaps the surviving family member who allowed Plaintiff to file a redacted version of a decedent's autopsy report on the docket had no issue with disclosing that decedent's autopsy report to anyone who could piece together the decedent's identity, thereby learning that he had a circumcised penis and "scratches" on his wrists, Autopsy Report (ECF No. 22-2) at 5, but reasonable minds may wonder if every one of that individual's surviving family members was consulted before his autopsy report was transformed into a legal prop.  *See* Declaration of Elizabeth A. Brehm (ECF No. 22-2) ¶ 6 (confirming only that a single family member granted permission to file the redacted autopsy report).

the effect that disclosure of the Autopsy Reports will have on surviving family members.  The Autopsy Reports at issue here describe the imperiled state of decedents' bodies at the time of death due to a variety of diseases and conditions, including those that have no causative link to vaccination against COVID-19.  *See id.* ¶¶ 12–13.  As a result, the Autopsy Reports contain highly sensitive and potentially embarrassing information, such as information about decedents' substance abuse, severe mental illness, or congenital disorders, a piece of medical information that has the potential to directly implicate surviving family members.  *Id.* ¶ 13.  These Autopsy Reports describe the circumstances surrounding an exceedingly sensitive moment in life—i.e., the death of a loved one, *see id.*—and information portraying the way a parent, child, sibling, or life partner died is certainly capable of evoking profound emotions in surviving family members, regardless of whether that information depicts "a gunshot wound or [the effects of a] gruesome plane crash." *Contra* Pl.'s Br. (ECF No. 22-1) at 9–10.

Even if the Court does not account for the reasonably foreseeable emotional trauma surviving family members will endure as a result of disclosing the Autopsy Reports, courts, including the D.C. Circuit, recognize that "unwanted contact following a FOIA disclosure," including contact made by unwanted and unsolicited mail, is an invasion of privacy sufficient to warrant protection under FOIA Exemption 6.  *Perioperative Servs.*, 57 F.4th at 1067–68 (quoting *ACLU*, 655 F.3d at 11); *see also Forest Guardians v. Fed. Emerg. Mgmt. Agency*, 410 F.3d 1214, 1220–21 (10th Cir. 2005); *Lesar v. Dep't of Just.*, 636 F.2d 472, 487 (D.C. Cir. 1980) (affirming denial of documents related to Dr. Martin Luther King, Jr.'s assassination to avoid "annoyance or harassment").  In *Perioperative Services*, the D.C. Circuit noted that the individual who submitted the record sought by the requestor had substantial privacy interests in "avoiding unwanted contact" with the requestor.  *Perioperative Servs.*, 57 F.4th at 1068.  FDA has sufficiently explained how

and why disclosure may very well result in unwanted contact through unsolicited mail or other means resulting in a disturbance or a level of unease that justifies withholding in full.  *See* Hyder Decl. (ECF No. 21-4) ¶¶ 12–20.

In response, Plaintiff raises four arguments.  Pl.'s Br. (ECF No. 22-1) at 8–13.  First, Plaintiff contends that family members have no expectation to privacy.  Second, Plaintiff claims that FDA's other disclosures demonstrate that disclosure is warranted here.  Third, Plaintiff asserts that it personally will not attempt to identify decedents.  Lastly, Plaintiff argues that redacted versions of the Autopsy Reports could strip out identifying information in a manner sufficient to protect the identities of decedents and surviving family members.  Each of these arguments fails.

First, as Plaintiff correctly points out, the Department of Health and Human Services has represented to the public that "[i]nformation identifying the person who received the vaccine and the person who filed the report is not made available to the public," so "patient identity is kept confidential."  *See* VAERS, *Report an Adverse Event to VAERS*, https://vaers.hhs.gov/reportevent.html (last accessed Sept. 13, 2023); VAERS, *Frequently Asked Questions (FAQs)*, https://vaers.hhs.gov/faq.html (last accessed Sept. 13, 2023).  Thus, family members understandably expect the government to protect their confidentiality.  *See, e.g.*, Nair Decl. (ECF No. 21-5) ¶ 16 (explaining that autopsy reports are submitted "with the understanding that the information in these reports would be kept confidential to the fullest extent of the law," that "[d]isclosure of the requested VAERS autopsy reports would undermine this understanding," and that "[d]isclosure of the requested VAERS autopsy reports could also result in a significant decline in voluntary reporting of adverse events and significantly impact FDA's ability to engage in effective post-market safety surveillance of COVID-19 vaccines going forward.").

Plaintiff attempts to twist this representation into a statement admitting that some information in the Autopsy Reports can be disclosed, but this argument fails in light of FDA's declarations. FDA attested that redacting names and isolated bits of information suggested by Plaintiff is not sufficient to protect the confidentiality of decedents and surviving family members. *See, e.g.*, Hyder Decl. (ECF No. 21-4) ¶ 19 ("It is reasonably foreseeable that FDA's public disclosure of redacted versions of the requested VAERS autopsy reports would harm surviving family members because Plaintiff or any member of the public can combine the information it receives with information in the public domain to identify the decedents and their next of kin."); *id.* ¶ 20 ("The density and potentially identifying nature of even seemingly non-identifying information in the autopsy reports makes partial disclosure insufficient to protect the privacy interests of surviving family members. I . . . confirmed that the reports cannot be produced in redacted form without harming the privacy interests of surviving family members."). As a result, FDA determined in this instance that it cannot disclose any information in the Autopsy Reports without risk of revealing the identity of decedents and their surviving family members or violating its promise to vaccine recipients and individuals who submit information to the Reporting System. *Marzen v. Dep't of Health & Hum. Servs.*, 825 F.2d 1148, 1154 (7th Cir. 1987) (holding that full withholding of the autopsy reports at issue was appropriate because disclosure "would undermine [the Department of Health and Human Services'] pledge to keep its records confidential").

Second, Plaintiff points to the fact that de-identified VAERS data is made available to the public for download, including information such as "VAERS ID number, age, sex, state of residence, a description of the adverse event(s) experienced by the recipient, prescription medications taken by the recipient, and concomitant illnesses experienced by the recipient," and argues that this information would not be made publicly available if it could be used to discern the

identities of decedents or their families.  Pl.'s Br. (ECF No. 22-1) at 10.  But this information, which is provided as part of a larger data set, is not linked to other specific information about the decedents, and, unlike the Autopsy Reports here, is incapable of being used to identify decedents in this form.  It is well recognized that "separate disclosures of otherwise innocuous information [can] be assembled by a requester or other person[s] to reveal" more sensitive information. *Whittaker v. Dep't of Just.*, Civ. A. No. 18-1434 (APM), 2020 WL 6075681, at *5 (D.D.C. Oct. 15, 2020).  The fact that FDA is willing to disclose other information, but not the Autopsy Reports, further demonstrates FDA's careful consideration of the privacy interests at issue, rather than some attempt to improperly conceal information.

It is important to stress that there are only 539 autopsy reports that meet the conditions here—i.e., a report of death to VAERS following the administration of a COVID-19 vaccine for which an autopsy report was included or later submitted.  Declaration of Beth Brockner Ryan ("Brockner Ryan Decl.") (ECF No. 21-3) ¶¶ 9, 11.  This is a small pool of de-identified data—so small that, if Alex knows Bob died after the administration of a COVID-19 vaccine, Alex has to flip through only 539 autopsy reports to figure out which report belongs to Bob.  That is not a herculean task given the information that Plaintiff proclaims should be disclosed (e.g., age and sex).  *See* Pl.'s Br. (ECF No. 22-1) at 11.

Take, for instance, the redacted autopsy report that Plaintiff submitted.  Autopsy Report (ECF No. 22-2) at 4–11.  If Alex knows that Bob is a "White male whose appearance is compatible with the stated age of 57 years" and that Bob's "body, when nude, weighs approximately 200 pounds and is 70 inches in length," Alex could be expected to find, at most, a few autopsy reports in this batch of 539 that match Bob's description.  *Id.* at 5.  If Alex knows that Bob had cardiovascular disease or any other details about Bob's death, *id.* at 9, or if Alex knows about the

scratches on Bob's wrists and forearms, *id.* at 5, Alex can be expected to figure out which autopsy report is Bob's without much effort.  Amongst 539 autopsy reports, Brockner Ryan Decl. (ECF No. 21-3) ¶ 11, a little knowledge goes a long way in enabling quick identification.

Third, Plaintiff's subjective intentions as to what it plans to do with the Autopsy Reports are irrelevant.  *Dep't of Def. v. Fed. Lab. Rels. Auth.*, 510 U.S. 487, 496 (1994).  Although Plaintiff claims that it will not attempt to identify decedents and contact surviving family members, Pl.'s Br. (ECF No. 22-1) at 12, Plaintiff cannot make the same guarantee for other members of the public and media, especially those with strong feelings against COVID-19 vaccines.  *See, e.g.*, Moises Velasquez-Manoff, *The Anti-Vaccine Movement's New Frontier*, N.Y. Times, May 31, 2022,  https://www.nytimes.com/2022/05/25/magazine/anti-vaccine-movement.html  ("On the ground, violence related to vaccines appears to be escalating.  In December [2021], an enraged man attacked workers at a mobile vaccine clinic in Tustin, in Orange County, calling them 'murderers.'  It took seven police officers with tasers, aided by workers and patients, to subdue him.  Late [2021], another man used his car to strike a vaccine worker in Los Angeles.  In Colorado, unknown assailants have tossed firecrackers into mobile vaccine tents, forcing the companies in charge to hire security.  Last spring, a woman plowed her minivan through a vaccine tent in Tennessee as she shouted, 'No vaccine!'"); Vineet Arora et al., *From Doxxing to Doctor Death Threats*, MedPage Today, June 22, 2023,  https://www.medpagetoday.com/opinion/second-opinions/105131 (noting how "vaccine scientist Peter Hotez, MD, PhD, became the target of significant online harassment" and "was approached unannounced outside his home by anti-vax activists" "after criticizing . . . Presidential candidate and vaccine skeptic Robert F. Kennedy Jr. and debunking many of Kennedy's claims as misinformation"); Regina Royan et al., *Physician and Biomedical Scientist Harassment on Social Media During the COVID-19 Pandemic*, JAMA

Network Open, June 14, 2023, https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2806018 ("Of 359 respondents [who were U.S.-based physicians, biomedical scientists, or trainees], 228 (64%) reported harassment related to comments made about the COVID-19 pandemic, 111 (31%) reported being sexually harassed, and 66 (18%) reported their private information had been shared ([i.e.], doxxing).").

Moreover, even "unwanted contact" from individuals with good intentions who do not seek to harass surviving family members implicates a substantial privacy interest. *See Marzen*, 825 F.2d at 1152 ("From all this information, it is probable that neighbors, relatives, friends and co-workers have deduced their identity.  If the documents are disclosed, many would learn the intimate details connected with the family's ordeal."); *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 876 (D.C. Cir. 1989) ("A non-embarrassing characteristic may or may not be otherwise significant, in a manner relevant to the individual's privacy interests, depending upon whether many parties in addition to the party making the initial FOIA request would be interested in obtaining a list of and contacting those who have that characteristic.").  Any of these occurrences is enough to force surviving family members to reengage with the details surrounding the circumstances of their loved ones' deaths, *see* Hyder Decl. (ECF No. 21-4) ¶ 13, in ways that cause "additional pain, disruption to peace of mind, additional anguish, or annoyance or harassment." *McWatters v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, Civ. A. No. 20-1092 (TSC), 2022 WL 3355798, at *3 (D.D.C. Aug. 15, 2022) (Exemption 7(C)); *Bowen v. FDA*, 925 F.2d 1225, 1228 (9th Cir. 1991) ("Exemption 6 is intended to protect 'individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information.'") (quoting *Wash. Post*, 456 U.S. at 599).

Lastly, to the extent that Plaintiff argues that disclosure of the Autopsy Reports does not implicate a substantial privacy interest because redaction would sufficiently protect decedents' identities, Plaintiff confuses the reasonable segregability analysis with the "substantial privacy interest" test.  The records in question are the Autopsy Reports themselves, not some redacted version of the Autopsy Reports that Plaintiff seeks to have FDA create.  Plaintiff's arguments regarding segregability are addressed below.

> 2.    *Disclosure of the Autopsy Reports Will Not Enable Plaintiff to Contribute to the Public's Understanding of COVID-19 Vaccine Safety.*

In light of the substantial privacy interests discussed above, the Court must examine the public interest in disclosure of these records and balance that interest against surviving family members' privacy interests.  *Telematch*, 45 F.4th at 351; *Reed*, 927 F.2d at 1251 (to maintain sufficient rights of access to government records, Congress requires the agency processing FOIA requests to identify private interests in non-disclosure and public interests in disclosure and balance those interests to determine whether disclosure of the information in the requested "personnel," "medical," or "similar" files would result in a substantial invasion of personal privacy for individuals implicated by this information); *see also Horner*, 879 F.2d at 874.

Disclosure of the Autopsy Reports will not enable Plaintiff "to contribute to the public understanding of the government's vaccine safety programs, including the government's efforts to promote vaccine safety," Pl.'s FOIA Request (ECF No. 1-1) at 8, or more generally to the public's understanding of what the government is up to.  In its brief, Plaintiff claims that it requested the Autopsy Reports to gain an understanding of "how deadly reactions to the Covid-19 vaccines manifest" so that it can "contribute to the American public's understanding of the safety of [ ] Covid-19 vaccines."  Pl.'s Br. (ECF No. 22-1) at 16.  To accomplish this goal, Plaintiff confirmed that it seeks "a vaccine recipient's VAERS ID number, age, sex, state of residence, a description

of the adverse event(s) experienced by the recipient, prescription medications taken by the recipient, and concomitant illnesses experienced by the recipient." Pl.'s Br. (ECF No. 22-1) at 10. Plaintiff also seeks causes of death and the substantive parts of the medical examiners' analysis like identifying marks and scars, evidence of acute injury, and toxicology reports. *Id*. at 12–13.

To the extent Plaintiff wants information that will enable it to contribute to the public's understanding of "how deadly reactions to Covid-19 vaccines manifest," *id*. at 16, the government has already made a litany of information available on public-facing websites, including information that provides a more comprehensive view than the Autopsy Reports, which may not reach definitive conclusions as to the ultimate cause of death in vaccine recipients. Nair Decl. (ECF No. 21-5) ¶ 10. This information can be obtained through the Reporting System, *see* Pl.'s Br. (ECF No. 22-1) at 10; VAERS, *VAERS Data*, https://vaers.hhs.gov/data.html (last accessed Sept. 13, 2023), and through numerous documents and resources disseminated by FDA and the CDC after FDA authorized the first COVID-19 vaccine for emergency use in the United States. These documents and resources include, but are not limited to, FDA review memoranda describing adverse reactions observed in clinical trials of the vaccines[4] and information and publications on findings of FDA and CDC safety monitoring efforts, including those related to death following COVID-19 vaccination.[5] There is also a wealth of information from other sources already in the

---

[4]     FDA, *Coronavirus (COVID-19) | CBER-Regulated Biologics*, https://www.fda.gov/vaccines-blood-biologics/industry-biologics/coronavirus-covid-19-cber-regulated-biologics (last updated July 14, 2023); FDA, *COMIRNATY*, https://www.fda.gov/vaccines-blood-biologics/comirnaty (last updated Apr. 21, 2023); FDA, *SPIKEVAX*, https://www.fda.gov/vaccines-blood-biologics/spikevax (last updated May 10, 2023).

[5]     *See, e.g.*, Stanley Xu et al., *COVID-19 Vaccination and Non–COVID-19 Mortality Risk — Seven Integrated Health Care Organizations, United States, December 14, 2020–July 31, 2021*, Morbidity and Mortality Weekly Report (Oct. 29, 2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7043e2.htm; Stanley Xu et al., *A safety study evaluating non-COVID-19 mortality risk following COVID-19 vaccination*, ScienceDirect (Jan. 16, 2023), https://www.sciencedirect.com/science/article/pii/S0264410X22015614?dgcid=raven_sd_aip_email; Hannah Rosenblum et al.,

public domain that discusses the safety of COVID-19 vaccines, including the risk of death associated with vaccination against COVID-19 and underlying causes that may explain why particular individuals suffered death after becoming vaccinated.[6]  These resources give Plaintiff the information it needs to contribute to the public understanding of the government's vaccine safety programs and its efforts to promote vaccine safety.  Pl.'s Br. (ECF No. 22-1) at 4.

Public availability of this information contradicts Plaintiff's claim that disclosure of the Autopsy Reports will advance its stated public interest.  *See, e.g.*, *Off. of the Cap. Collateral Couns. v. Dep't of Just.*, 331 F.3d 799, 804 (11th Cir. 2003) (finding there was substantial public information available about an AUSA's misconduct and therefore, any "public interest in knowing how DOJ responded to [the AUSA's] misconduct can be satisfied by this other public information"); *Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*, 524 F.3d 1021, 1028 (9th Cir. 2008) ("As a result of the substantial information already in the public domain, we must conclude that the release of the" information sought "would not appreciably further the public's important interest in monitoring the agency's performance[.]")

To the extent that information in the Autopsy Reports is not already available through de-identified public sources, the Autopsy Reports alone cannot establish causal links between the overall risk of death and COVID-19 vaccines.  Def.'s Br. (ECF No. 21-1) at 24–27; Nair Decl.

---

*Safety of mRNA vaccines administered during the initial 6 months of the US COVID-19 vaccination programme: an observational study of reports to the Vaccine Adverse Event Reporting System and v-safe*, The Lancet: Infectious Diseases (June 6, 2022), https://www.sciencedirect.com/science/article/pii/ S1473309922000548?via%3Dihub.

[6]     Vahe Nafilyan et al., *Risk of death following COVID-19 vaccination or positive SARS-CoV-2 test in young people in England*, Nature (March 27, 2023), https://www.nature.com/articles/ s41467-023-36494-0; Lisa Maragakis & Gabor Kelen, *Is the COVID-19 Vaccine Safe?*, Johns Hopkins Medicine (updated Jan. 4, 2022), https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/is-the-covid-19-vaccine-safe; Chupong Ittiwut et al., *Genetic basis of sudden death after COVID-19 vaccination in Thailand*, Nat'l Insts. of Health (Aug. 5, 2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9352648/.

(ECF No. 21-5) ¶¶ 9, 10, 15.  FDA's evaluation of autopsy reports submitted to the Reporting System is only one part of the agency's overall assessment to determine whether a COVID-19 vaccine presents a higher risk of death to the population at large than is already understood by experts and has been communicated to the general public.  Def.'s Br. (ECF No. 22-1) at 26; Nair Decl. (ECF No. 21-5) ¶ 14.  And, as FDA previously noted, autopsy reports have only been appended to 2.8% of the total death reports made to the Reporting System.  Def.'s Br. (ECF No. 21-1) at 26–27.  Thus, the Autopsy Reports collected by FDA represent a tiny fraction of the total preliminary reports of death following the administration of a COVID-19 vaccine submitted to the database, meaning they are an insufficient proxy to evaluate "the government's [COVID-19] vaccine safety programs" and "the government's efforts to promote [COVID-19] vaccine safety," let alone "how the Covid-19 vaccines contribute[ ] to death" in the population at large.  *Id.* at 27; Pl.'s Br. (ECF No. 22-1) at 16.

Accordingly, the Autopsy Reports will not give Plaintiff information that directly advances the public interests it put forward.  Pl.'s Br. (ECF No. 22-1) at 16; *see also Barnard v. Dep't of Homeland Sec.*, 598 F. Supp. 2d 1, 13 (D.D.C. 2009) ("Where, as here, the nexus between the information sought and the asserted public interest is lacking, the asserted public interests will not outweigh legitimate privacy interests [under Exemption 6].").  Disclosing the Autopsy Reports would serve only to publicize anecdotal descriptions of particular human beings' most personal moments and most private information.

        3.    *The Public Interest in Disclosure of the Autopsy Reports Does Not Outweigh Surviving Family Members' Privacy Interests in Non-Disclosure.*

Upon identifying the substantial privacy interest and the absence of any connection between the identified public interest and the records requested, the results of the Exemption 6 balancing test become clear.  Plaintiff fails to explain how the public's interest in disclosure

outweighs surviving family members' substantial privacy interests in non-disclosure of the Autopsy Reports.  Plaintiff devotes two short sentences to balancing the interests, and rather than acknowledging surviving family members' very real interests, Plaintiff summarily states that these interests do not outweigh the "public interest in the safety of the Covid-19 vaccines."  Pl.'s Br. (ECF No. 22-1) at 16.  For surviving family members, the Autopsy Reports serve as a reminder that they lost someone.  They also contain highly sensitive, potentially embarrassing information regarding mental health diagnoses, toxicology reports (i.e., evidence of substance abuse), and genetic disorders.  Hyder Decl. (ECF No. 21-4) ¶¶ 12–13.  Disclosure of any of this information, and the knowledge that others know such sensitive information about you and your loved ones, is more than enough to cause surviving family members mental anguish, as well as annoyance or disruption of peace of mind.  *McWatters*, 2022 WL 3355798, at *3.

Plaintiff also fails to account for the political salience of anti-COVID-19 vaccine sentiment and how dissemination of the information it seeks will enable those with bad intentions to further infringe on the privacy rights of surviving family members.  And Plaintiff requested information that will not advance its stated public interests and that is already available in part through de-identified publicly available sources.  FOIA Exemption 6 was enacted to protect individuals' privacy rights by excluding from disclosure the kinds of records which might harm an individual. *Rural Hous. All. v. Dep't of Agric.*, 498 F.2d 73, 77 n.13 (D.C. Cir. 1974) (quoting H.R. Rep. No. 1497, 89th Cong., 2d Sess. 11 (1966)); *see also Bowen*, 925 F.2d at 1228.  The Autopsy Reports at issue here are precisely those types of records.  The balance of interests weighs in favor of surviving family members and against Plaintiff, and the Autopsy Reports should be withheld in their entirety.

### C. To the Extent the Autopsy Reports Contain Non-Exempt, Responsive Information, It Is Not Reasonably Segregable from Information Protected by Exemption 6.

Because redacted versions of the Autopsy Reports would not protect the substantial privacy interests at hand, FDA cannot reasonably segregate non-exempt, responsive information in the Autopsy Reports. *See* Hyder Decl. (ECF No. 21-4) ¶ 20 ("The density and potentially identifying nature of even seemingly non-identifying information in the autopsy reports makes partial disclosure insufficient to protect the privacy interests of surviving family members."). FDA's carefully considered assessment of that issue, *see, e.g.*, Jt. Status Rep. (ECF No. 17) ¶ 3, is "accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims.'" *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F2d 770, 771 (D.C. Cir. 1981)).

Under the mosaic theory, information that cannot identify an individual in one context, can identify an individual in another context. That is why FDA designed the hypothetical discussed in its brief: to demonstrate how easy it is for Plaintiff or any member of the public to use even partial disclosures of the Autopsy Reports to identify decedents and their surviving family members. *See* Def.'s Br. (ECF No. 21-1) at 18–19; *see also Forest Guardians*, 410 F.3d at 1220–21 (where the Court held that files sought were exempt from disclosure under FOIA Exemption 6 because disclosure could lead to discovery of individuals' names and home addresses, even though identification would occur only after manipulation of information in the records).

Plaintiff submitted a redacted autopsy report from an individual that passed away after receiving a COVID-19 vaccine to support its argument that FDA can redact certain pieces of information in the Autopsy Reports to protect the identities of decedents and their surviving family members. *See* Autopsy Report (ECF No. 22-2) at 4–11. Plaintiff argues that FDA should be

required to redact "the decedent's name, the date of examination, details about the doctor performing the autopsy, the name and location of the funeral home[,] and any family members' name or contact information . . . [and] the decedents' eye and hair color," but disclose information like a vaccine recipient's age, sex, height, weight, state of residence, a description of the adverse event(s) experienced by the recipient, cause of death, identifying marks and scars (including, as demonstrated by the redacted autopsy report submitted by Plaintiff, whether the decedent's penis is circumcised), tattoos and piercings, evidence of acute injury, and toxicology reports.  Pl.'s Br. (ECF No. 22-1) at 12–13; Autopsy Report (ECF No. 22-2) at 5.

Plaintiff's suggestion that FDA merely redact what it views as personally identifying information, and Plaintiff's assertion that the "majority of the report[s] and [their] findings are easily segregable," further demonstrates Plaintiff's misunderstanding of the nature and character of the information in the Autopsy Reports, the mosaic theory, and FDA's obligation to safeguard common and uncommon identifying information contained in records in its possession.  *See generally* 21 C.F.R. Part 20; *see also* Hyder Decl. (ECF No. 21-4) ¶¶ 6, 8.  As explained in FDA's opening brief and supporting declarations, Plaintiff or other members of the public can combine discrete pieces of information (e.g., a vaccine recipient's demographic information, state of residence, identifying marks or scars, and cause of death, etc.) with information in publicly available records (e.g., obituaries, news articles) to identify decedents and their surviving family members.  Def.'s Br. (ECF No. 21-2) at 17–19; Hyder Decl. (ECF No. 21-4) ¶¶ 11–19; *see also N.Y. Times Co. v. Nat'l Aeronautics & Space Admin.*, 782 F. Supp. 628, 632 (D.D.C. 1991) (noting the importance of context in determining the protectability of information under FOIA Exemption 6).  Put simply, death leaves a paper trail, and this trail can be reassembled by collecting seemingly disparate pieces of information, which then can be used to identify a decedent or their

next of kin and link them to personal information that causes injury or embarrassment to those individuals. *See Rural Hous. All.*, 498 F.2d at 77 n.13 (noting that Congress "intended [FOIA Exemption 6] to cover detailed Government records on an individual which can be identified as applying to that individual") (quoting H.R. Rep. No. 1497, 89th Cong., 2d Sess. 11 (1966)).

FDA conducted a line-by-line review of a representative sample of the Autopsy Reports and determined that they are not reasonably segregable because the "density and potentially identifying nature of even seemingly non-identifying information . . . makes partial disclosure insufficient to protect the privacy interests of surviving family members." Hyder Decl. (ECF No. 21-4) ¶ 20; *see also Reps. Comm. for Freedom of the Press v. Dep't of Just.*, 3 F.4th 350, 368 (D.C. Cir. 2021) ("To the extent that [plaintiffs] suggest that the district court erred in relying on a representative sample or categorical description of the documents at issue, they are mistaken. Such 'categorization and repetition provide efficient vehicles' for reviewing an agency's withholding decisions when they 'implicate the same exemption for similar reasons.'") (quoting *Jud. Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 147 (D.C. Cir. 2006)). FDA is not required to disclose redacted versions of the Autopsy Reports because the necessary redactions would be so substantial that "the unredacted markings would 'have minimal or no information content'" absent necessary context. *Perioperative Servs.*, 57 F.4th at 1068–69 (quoting *Mead Data Ctr., Inc. v. Dep't of Air Force*, 566 F.2d 242, 261 n.55 (D.C. Cir. 1977)).

Plaintiff also argues that FDA failed to prove that non-exempt, responsive information in the Autopsy Reports is not reasonably segregable because it did not submit a redacted sample record to the Court, *see* Pl.'s Br. (ECF No. 22-1) at 14, but FDA is not required to submit this kind of evidence to support its disclosure analysis. The declarations FDA submitted make clear that any non-exempt information in the Autopsy Reports is inextricably intertwined with exempt

information.  *Covington v. McLeod*, No. 09-5336, 2010 WL 2930022 (D.C. Cir. July 18, 2010) (per curiam) (summarily affirming the District Court; "the exempt and non-exempt information . . . are 'inextricably intertwined,' any excision of exempt information would impose significant costs on the agency and produce edited documents with little informational value") (citing *Mays v. Drug Enf't Admin.*, 234 F.3d 1324, 1327 (D.C. Cir. 2000)).  Moreover, to the extent that Plaintiff believes a sample autopsy report should have been provided to the Court, it has now done so. Plaintiff's autopsy report serves only to confirm that FDA cannot safely produce redacted versions of the Autopsy Reports.  Requiring FDA to determine which portions of these autopsy reports should be withheld to adequately protect decedents' identities is a perilous task with no upside and many substantial privacy implications in light of how few autopsy reports fall into the category at hand.

*   *   *

As a final note, FDA reiterates that disclosure of the Autopsy Reports will harm decedents' loved ones and FDA as an institution.  Because disclosure of the Autopsy Reports "would undermine th[e] [public's] understanding" of their confidentiality, FDA reasonably anticipated that disclosure risks  "a significant decline in voluntary reporting of adverse events," which would "significantly impact FDA's ability to engage in effective post-market safety surveillance of COVID-19 vaccines going forward."  Nair Decl. (ECF No. 21-5) ¶ 16.  The Exemption 6 balancing test and the harm to surviving family members and FDA's institutional interests counsel strongly in favor of withholding the Autopsy Reports in full.

*   *   *

## CONCLUSION

For all the reasons set forth above and in FDA's opening brief and supporting declarations, FDA respectfully requests that the Court grant summary judgment in its favor and deny Plaintiff's cross-motion for summary judgment.

Dated: September 14, 2023
       Washington, DC

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: _____ /s/ *Douglas C. Dreier* _____
    DOUGLAS C. DREIER
    D.C. Bar #1020234
    Assistant United States Attorney
    601 D Street, NW
    Washington, DC 20530
    (202) 252-2551

*Attorneys for the United States of America*

Of counsel:

SAMUEL BAGENSTOS
General Counsel
Dep't of Health and Human Services

MARK RAZA
Chief Counsel

WENDY VICENTE
Deputy Chief Counsel, Litigation

JOSHUA FREDA
Associate Chief Counsel
Office of the Chief Counsel
U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993