UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

INFORMED CONSENT ACTION
NETWORK,

        Plaintiff,

   v.

FOOD AND DRUG ADMINISTRATION,

        Defendant.

Civil Action No. 22-3572 (CKK)

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS-MOTION**
**FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

BACKGROUND .................................................................................................................... 1

ARGUMENT ........................................................................................................................ 3

   I.  Plaintiff Waived Its Challenge to Personally Identifying Information. ................................. 3

   II.  Even If Plaintiff Did Not Waive These Challenges, the Information It Demands Is Covered by FOIA Exemption 6 Because It Can Be Identified as Applying to the Decedents and Its Disclosure Is Reasonably Expected to Cause Foreseeable Harm.................................................. 8

   III. The Remaining Information Contains Minimal or No Information Value.......................... 13

   IV. Even If a Dispute of Material Fact Remained, That Would Not Mean That Plaintiff Is Entitled to Summary Judgment. ...................................................................................... 15

CONCLUSION................................................................................................................... 16

TABLE OF AUTHORITIES

**Cases**                                                                                                        **Page(s)**

\* *Dep't of State v. Wash. Post Co.*,
456 U.S. 595 (1982) ................................................................................................ 8, 9, 10

*Eddington v. Dep't of Def.*,
35 F.4th 833 (D.C. Cir. 2022) ............................................................................................ 11

*Gannett Satellite Info. Network, LLC v. Dep't of Just.*,
Civ. A. No. 22-0475 (BAH), 2023 WL 2682121 (D.D.C. Mar. 29, 2023) ............................ 7

*Henderson v. Dep't of Just.*,
157 F. Supp. 3d 42 (D.D.C. 2016) ...................................................................................... 8

*In re Marriott Int'l Customer Data Sec. Breach Litig.*,
MDL No. 19-2879, 2022 WL 951692 (D. Md. Mar. 30, 2022) ........................................... 8

*Larson v. Dep't of State*,
565 F.3d 857 (D.C. Cir. 2009) ............................................................................................ 3

*McDowell v. CGI Fed. Inc.*,
Civ. A. No. 15-1157, 2017 WL 2392423 (D.D.C. June 1, 2017) ..................................... 7-8

*Mead Data Ctr., Inc. v. Dep't of Air Force*,
566 F.2d 242 (D.C. Cir. 1977) ......................................................................................... 16

*Miller v. Casey*,
730 F.2d 773 (D.C. Cir. 1984) ............................................................................................ 3

\* *Perioperative Servs. & Logistics, LLC v. Dep't of Veterans Affs.*,
57 F.4th 1061 (D.C. Cir. 2023) .................................................................................... 15, 16

*Reed v. NLRB*,
927 F.2d 1249 (D.C. Cir. 1991) .......................................................................................... 8

*Republican Nat'l Comm. v. FEC*,
76 F.3d 400 (D.C. Cir. 1996) .............................................................................................. 7

*SafeCard Servs., Inc. v. SEC*,
926 F.2d 1197 (D.C. Cir. 1991) ........................................................................................ 11

*Wattleton v. Dep't of Just.*,
No. 22-5337, 2023 WL 6531751 (D.C. Cir. Oct. 5, 2023) ................................................ 11

*Wolf v. CIA*,
473 F.3d 370 (D.C. Cir. 2007) ............................................................................................ 3

**Statutes**

5 U.S.C. § 552 ............................................................................................ 8, 12, 13, 14, 15

**Regulations**

21 C.F.R. § 20.63 ................................................................................................................ 8

Defendant, the United States Food and Drug Administration ("FDA" or the "Agency"), respectfully submits this opposition to Plaintiff Informed Consent Action Network's ("ICAN") cross-motion for summary judgment (ECF No. 31).

## BACKGROUND

Pursuant to the Court's Order, the parties are currently engaged in simultaneous summary judgment briefing. *See, e.g.*, Min. Orders (Dec. 6, 2024; Dec. 20, 2024). Both parties filed their renewed motions for summary judgment on January 17, 2025. Both parties are filing their oppositions today, and both parties' replies are due February 21, 2025.

Plaintiff's opening brief is premised on the record that existed at the time the motion was prepared and, thus, does not account for the Declaration of Elizabeth Teter-Gossmann ("Teter-Gossmann Decl.," ECF No. 30-2). The Teter-Gossmann Declaration confirms that FDA "performed a careful page-by-page, line-by-line review of each autopsy report responsive to Plaintiff's FOIA request to determine whether all of the information contained therein was properly withheld under FOIA Exemption 6."[1] Teter-Gossmann Decl. ¶ 9. "Each entry of the *Vaughn* index [(ECF No. 28-1)] identifies the specific material subject to Exemption 6, and each entry identifies the specific material that, while not itself subject to Exemption 6, is inextricably intertwined with exempt portions and, without production of accompanying material subject to Exemption 6, would have minimal or no information content." *Id.* ¶ 12. It confirms that "disclosing any of the information protected by Exemption 6 is reasonably likely to result in

---

[1]      It also explains the issue regarding the number of entries in FDA's *Vaughn* index (ECF No. 28-1), which Plaintiff notes in a footnote. *See* Pl.'s 2d Open. Br. (ECF No. 31-1) at 4 n.1; *see also* Teter-Gossmann Decl. ¶ 10 ("Please note that only 539 of these 593 entries contained autopsy reports, which is why there are more entries for the *Vaughn* index than there are responsive records. The following entries are nonresponsive: Index Nos. 10, 17, 28, 37, 73, 94, 129, 150, 217, 218, 220, 222, 227, 228, 234, 235, 237, 250, 262, 273, 298, 354, 355, 365, 375, 386, 388, 390, 391, 416, 421, 441, 453, 457, 460, 462, 466, 480, 495, 501, 506, 511, 515, 519, 524, 533, 536, 538, 540, 546, 561, 567, 570, and 577.").

foreseeable harm to the decedents' families because, under a mosaic theory, individuals would likely be able to piece together this information from the autopsy reports to determine the decedents' identities." *Id.* ¶ 13.

Plaintiff's opening brief acknowledged that certain information contained in the Autopsy Reports was appropriately withheld—specifically, "ICAN is not seeking: decedent's full name, address, DOB, telephone no., facility information where vaccine was given, full medical history, email address, social security number, place of death, parents' names, next of kin name/address, or funeral home information." Pl.'s 2d Open. Br. (ECF No. 31-1) at 11. Despite Plaintiff's prior knowing waiver to redaction of personally identifying information, *see* Def.'s 2d Open. Br. (ECF No. 30-1) at 15–16 (quoting Pl.'s 1st Open. Br. (ECF No. 22-1) at 12–14; also quoting Pl.'s 1st Reply (ECF No. 25) at 4, 11), Plaintiff now claims that it "*is* seeking: year of birth, race, sex, ethnicity, date when vaccine was given, list of medication, allergies, any non-identifying portions of the full medical history, chronic/long-standing health conditions, circumstances as to how decedent died, date and cause of death, toxicology test results, occupation, marital status, and any other information that is not personally identifying." Pl.'s 2d Open. Br. (ECF No. 31-1) at 11 (emphasis in original).

Plaintiff's opening brief also claims that the descriptions of certain material in FDA's prior briefing do not perfectly mirror FDA's *Vaughn* index. *Id.* Specifically, Plaintiff questions where the (1) "name of cemetery or crematory," (2) "name of funeral director," (3) "name of the autopsy attendant(s)," (4) "date, time, or place of autopsy," and (5) the "case numbers associated with the Autopsy Reports" appear in FDA's *Vaughn* index. *Id.* But to parallel the numbering in the prior sentence, the *Vaughn* index includes references to: (1) decedent's method and/or place of disposition, Def.'s 2d Open. Br. (ECF No. 30-1) at 14 (citing *Vaughn* Index (ECF No. 28-1) at 148,

2

228); (2) information identifying the decedent's funeral home, *id.* (citing *Vaughn* Index at 2); (3) the personal information of the person who filled out the document, *id.* at 15 (citing *Vaughn* Index at 2, 4); (4) date of service, *id.* at 14 (citing *Vaughn* Index at 298), and personal information of the person who filled out the document (e.g., name and address), *id.* at 15 (citing *Vaughn* Index at 2, 4); and (5) the *Vaughn* index confirms that the "VAERS ID No. [i.e., the case number associated with the Autopsy Report] [Was] Withheld Under (b)(6)," *see, e.g.*, *Vaughn* Index at 2 (repeated in the heading row throughout).   There is no inconsistency between FDA's prior descriptions and the *Vaughn* Index.

## ARGUMENT

The Court should grant FDA's motion for summary judgment and deny Plaintiff's cross-motion.  FDA has "describe[d] the justifications for nondisclosure with reasonably specific detail [and] demonstrate[d] that the information withheld logically falls within the claimed exemption," and the agency's justifications are "not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)).  As the D.C. Circuit has noted, "an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Miller*, 730 F.2d at 776 (internal quotation marks omitted; quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007)).  FDA has fully supported its assertion of FOIA Exemption 6 to withhold the Autopsy Reports in full.

I.    **Plaintiff Waived Its Challenge to Personally Identifying Information.**

Plaintiff has waived its challenge to the decedents' "birth, race, sex, ethnicity, date when vaccine was given, list of medication, allergies, any non-identifying portions of the full medical history, chronic/long-standing health conditions, circumstances as to how decedent died, date and

3

cause of death, toxicology test results, occupation, [and] marital status," the disclosure of which it now demands, Pl.'s 2d Open. Br. (ECF No. 31-1) at 11.  Specifically, "ICAN has made clear that it seeks the Autopsy Reports with personally identifying information redacted."  Pl.'s 1st Reply (ECF No. 25) at 11.  Thus, the only information to which Plaintiff has not waived its challenge is "information that is not personally identifying."  Pl.'s 2d Open. Br. (ECF No. 31-1) at 11.

Definitions of personally identifiable (or identifying) information—commonly referred to as "PII"—abound, but they all return to the same fundamental truth that is inherent in the words themselves: any information that can be used to identify a person.  For instance, the Office of Management and Budget issued a circular to all executive departments and agencies that identifies PII as "information that can be used to distinguish or trace an individual's identity, either alone or when combined with other information that is linked or linkable to a specific individual."  Off. of Mgmt. & Budget, Circular No. A-130, *Managing Information as a Strategic Resource* ¶ 10(a)(57) (page 33 of the PDF), July 27, 2016, *available at* https://obamawhitehouse.archives.gov/sites/default/files/omb/assets/OMB/circulars/a130/a130revised.pdf.  An FDA Staff Manual Guide, which sets forth the Agency's policy for implementing the Privacy Act and its Privacy Program, relies on that definition and describes PII further as follows:

> **Definition of Personally Identifiable Information**
>
> The federal government has adopted a broad definition of "personally identifiable information."[2]  PII refers to any information which can be used to distinguish or trace an individual's identity (e.g., name, Social Security number (SSN), passport number, patient number, telephone number, email address, biometric records, etc.), either standing alone, or when combined with other personal or identifying information which is linked or linkable to a specific individual.  For example, many

---

[2]    [Footnote in source:] "The term 'PII,' as defined by [the Office of Management and Budget] refers to information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information that is linked or linkable to a specific individual." [citing Circular No. A-120, quoted above].

individuals may share a date of birth, place of birth, or last name, but if there were a way to connect all three of these elements held in separate records to a single individual, the three items together would most likely identify a single individual. Also, there are some items of information that may not at first consideration seem to identify an individual, but may be easily used to do so. A website visited, for example, would not seem to identify an individual, but if that website linked to an individual's social media page[,] it could be used, alone or in combination, to identify the individual.

The definition of PII is not anchored to any single category of information or technology. It calls for a case-by-case assessment of the specific risk that an individual can be identified. In performing this assessment, recognize that non-PII can become PII whenever additional identifying information is added—in any medium and from any source. Personal information that could be used to identify any individual is PII. Neither the manner in which the information is collected, nor the nature of its connection to the individual determines whether information is PII. Information that is PII remains so whether the PII is publicly available, provided voluntarily, or collected by mandate. PII remains PII whether it pertains to employees, the public, research subjects, business partners or other individuals. Data that identifies or is linkable to an individual in his/her personal or professional/work capacity is PII. For example, business contact information about FDA employees which the Agency makes available to the public is PII, although it seems obvious that this information requires a lower standard of protection than more sensitive PII such as health records, human resources and personnel records, investigatory files, and financial account information.

FDA, *Staff Manual Guides: Policy for Implementation of the Privacy Act and the FDA Privacy Program: Overview* ¶ 3(B) (pages 3–4 of the PDF), Sept. 28, 2023, *available at* https://www.fda.gov/media/81465/download. FDA's expounding of the PII definition thus confirms a few common sense conclusions: (1) "health records" are some of the "more sensitive PII"; (2) the definition of PII is intentionally "broad" to avoid intruding on privacy interests that even Plaintiff recognizes as vitally important;[3] and (3) PII includes far more than an individual's

---

[3]    *See, e.g.*, ICAN, *ICAN Sends Legal Demand to Michigan About Its Illegal Privacy Violations Related to Vaccine Exemptions*, June 12, 2023, https://icandecide.org/press-release/ican-sends-legal-demand-to-michigan-about-its-illegal-privacy-violations-related-to-vaccine-exemptions/ ("ICAN's attorneys point out that, in clear violation of privacy laws, [the Michigan Department of Health and Human Services] is permitting local health departments to store confidential information in the state's vaccine registry. In addition, local health departments are permitted to create electronic health records for families who claim a nonmedical vaccine

name and Social Security number and also includes any information that can possibly be strung together to identify an individual. *Id.*; *see also* Dep't of Energy, *Personally Identifiable Information (PII)*, https://www.directives.doe.gov/terms_definitions/personally-identifiable-information-pii (last accessed Feb. 7, 2025) ("Any information collected or maintained by the Department about an individual, including but not limited to, education, financial transactions, medical history and criminal or employment history, and information that can be used to distinguish or trace an individual's identity, such as his/her name, Social Security number, date and place of birth, mother's maiden name, biometric data, and including any other personal information that is linked or linkable to a specific individual."). As detailed above, any information that is linked or linkable to a specific individual is PII.

It cannot be reasonably disputed that the following information about a person is PII: "year of birth"; "race"; "sex"; "ethnicity"; "date when vaccine was given"; "list of medications"; "allergies"; "full medical history"; "chronic/long-standing health conditions"; "circumstances as to how [the person] died"; "date and cause of death"; "toxicology test results"; "occupation"; and "marital status." *Contra* Pl.'s 2d Open. Br. (ECF No. 31-1) at 11. All this information is linked or linkable to a specific individual. Indeed, on the same page of its brief, Plaintiff continues to aver that "ICAN is not seeking: decedent's . . . DOB [and] . . . full medical history." *Id.* Plaintiff cannot earnestly contend that a decedent's "full medical history" excludes Plaintiff's date of vaccination, list of mediations, drug allergies, chronic and longstanding health conditions,

---

exemption, thereby capturing and storing private information that they are not entitled to collect. To add insult to injury, the local health departments don't disclose to parents that they are creating these records or inputting them into the state's tracking system."); ICAN, *First, the Government Played Doctor. Now It Wants to Play God!*, Apr. 25, 2022, https://icandecide.org/press-release/first-the-government-played-doctor-now-it-wants-to-play-god/ ("Well, the Constitution has just taken another hit, and we're mobilizing again to defend it. The reason is that our infernal authorities, not content with demanding to know your medical status, now want unfettered access to your religious status too!").

circumstances as to how the decedent died, date and cause of death, and toxicology test results, nor can Plaintiff earnestly contend that this information does not qualify as PII.

That leaves the decedent's year of birth, race, sex, ethnicity, occupation, and marital status, which Plaintiff continues to seek. But again, it cannot be disputed that someone's "DOB" includes their year of birth, and Plaintiff has reiterated that it is not seeking decedent's DOBs. *Id.* And birthyear is classic PII information. As for race, sex, and ethnicity, it makes no sense to claim that the Agency can "redact characteristics such as the decedents' eye and hair color," *id.* at 13, but not the decedent's other physical characteristics, such as race, sex, and ethnicity. These are characteristics of the same sort as the decedent's eye and hair color (and largely correlated to wit), and they are, again, classic PII. *See Gannett Satellite Info. Network, LLC v. Dep't of Just.*, Civ. A. No. 22-0475 (BAH), 2023 WL 2682121, at *8 (D.D.C. Mar. 29, 2023) ("The information the [Death in Custody Reporting Act of 2013] requires to be reported to the Attorney General includes personal, identifying information about individuals arrested, incarcerated, detained, or in the process of which, including, inter alia, their names, gender, race, age, date and time of their death, and the circumstances surrounding their death." (citing Pub. L. No. 113-142, § 2(b), 128 Stat. 2860, 2860 (2014))).

Likewise, the decedent's occupation is PII. *See, e.g.*, *Republican Nat'l Comm. v. FEC*, 76 F.3d 400, 403, 406 (D.C. Cir. 1996) (explaining that the Federal Election Campaign Act requires political committees to demonstrate that they have exercised their best efforts "to encourage donors to disclose certain personally identifying information"—namely, "their name, address, occupation, and employer"); *McDowell v. CGI Fed. Inc.*, Civ. A. No. 15-1157, 2017 WL 2392423, at *1 (D.D.C. June 1, 2017) ("Passport applicants must submit sensitive and personally identifiable information, including: name, date of birth, city of birth, state of birth, country of birth,

7

social security number, sex, height, hair color, eye color, occupation, and evidence of U.S. Citizenship, such as a previously issued U.S. Passport or U.S. birth certificate.").

The decedent's marital status is also PII.  *See In re Marriott Int'l Customer Data Sec. Breach Litig.*, MDL No. 19-2879, 2022 WL 951692, at *4 (D. Md. Mar. 30, 2022) ("Courts in this District and across the country routinely permit parties to redact or seal the types of PII contained in the Poindexter Report, including, without limitation, home addresses, phone numbers, email addresses, dates of birth, marital status, and personal employment information[.]" (collecting authorities)).  All of the information Plaintiff seeks is information that is linked or linkable to the decedent and, therefore, constitutes PII.  Accordingly, Plaintiff—in, at minimum, its first reply brief—has waived its demand for all categories of information that Plaintiff now seeks besides "information that is not personally identifying."  Pl.'s 2d Open. Br. (ECF No. 31-1) at 11.

II. **Even If Plaintiff Did Not Waive These Challenges, the Information It Demands Is Covered by FOIA Exemption 6 Because It Can Be Identified as Applying to the <u>Decedents and Its Disclosure Is Reasonably Expected to Cause Foreseeable Harm.</u>**

FOIA Exemption 6 protects from disclosure "personnel and medical files and similar files" where the release of such records "would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6); 21 C.F.R. § 20.63.  This exemption shields records in the government's possession that could be used to identify an individual, including persons not discussed directly by information in these records when disclosure might result in injury or embarrassment to these individuals.  *Henderson v. Dep't of Just.*, 157 F. Supp. 3d 42, 50 (D.D.C. 2016).  Specifically, the Supreme Court interprets Exemption 6 as covering any records in the government's possession that discuss "an individual . . . [and] can be identified as applying to that individual," *Reed v. NLRB*, 927 F.2d 1249, 1250–51 (D.C. Cir. 1991) (quoting *Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 600–02 (1982)), even if those records do not contain "'intimate details' [or] 'highly personal' information.'"  *Wash. Post*, 456 U.S. at 600.

It cannot be reasonably disputed that information identifying an individual's "year of birth," "race," "sex," "ethnicity," "date when vaccine was given," "list of medications," "allergies," "full medical history," "chronic/long-standing health conditions," "circumstances as to how decedent died," "date and cause of death," "toxicology test results," "occupation," and "marital status," Pl.'s 2d Open. Br. (ECF No. 31-1) at 11, is "information which applies to a particular individual," which alone suffices to trigger the Exemption 6 analysis. *Wash. Post*, 456 U.S. at 602.

The next question is whether "release of th[is] information would constitute a clearly unwarranted invasion of that person's privacy." *Id.* FDA understands that the Court has already resolved this issue in FDA's favor after a thorough analysis of FDA's declaratory support. *See* Mem. Op. (ECF No. 26) at 6–10. The issue that remains is only whether FDA can "satisf[y] its burden as to segregability" on the more fulsome record it has now provided. *Id.* at 10.

To the extent that Plaintiff is implicitly moving for reconsideration of the Court's prior Order regarding the Exemption 6 balancing analysis, FDA reincorporates its prior arguments regarding the importance of avoiding an unwarranted invasion of the decedents' and their family members' privacy. *See, e.g.*, Def.'s 1st Open. Br. (ECF No. 21-1) at 15–33; Def.'s 1st Reply (ECF No. 23) at 10–27. It bears emphasis that, in this case, the foreseeable harm from disclosure is closely tethered to the invasion of privacy interest. In short, "FDA expects that disclosing any of the information protected by Exemption 6 is reasonably likely to result in foreseeable harm to the decedents' families because, under a mosaic theory, individuals would likely be able to piece together this information from the autopsy reports to determine the decedents' identities." Teter-Gossmann Decl. (ECF No. 30-2) ¶ 13.

How this mosaic theory would play out in practice is described in detail in the Declaration of John Hyder ("Hyder Decl.," ECF No. 21-4). "The requested [ ] autopsy reports contain various pieces of information that are readily understood as identifying the person being discussed by the report." Hyder Decl. ¶ 12. "These include, but are not limited to, the decedent's name, age, race, sex, and date of birth." *Id.* "The requested [ ] autopsy reports also contain numerous seemingly innocuous pieces of information that can be used to determine the decedents' identities." *Id.* "This information includes, but is not limited to: tattoos, piercings, scars, or other unique identifiers on the body; information concerning any illness, disability, injury, or condition, including death; any symptom or manifestation of such illness, disability, injury, or condition, including those relating to death; name of medical examiner(s); location of the medical examiner(s), name(s) of the autopsy attendant(s); date of autopsy; time of autopsy; place of autopsy (state/locality); date of death; time of death; place of death; cause of death; manner of death; other conditions related to death; date the death certificate is issued; the VAERS IDs associated with the autopsy reports; and the case numbers associated with the autopsy reports." *Id.* "Some of the requested [ ] autopsy reports also contain unique or sensitive identifying information from the decedents' medical histories, including information about genetic diseases, congenital disorders, chronic conditions, substance abuse, and mental illness, and details surrounding the circumstances of the decedents' deaths." *Id.* ¶ 13.

"Alone, any one of these pieces of information may not be used to identify an individual, but when combined with information in the public domain, they are likely to reveal the decedents' identities." *Id.* ¶ 14. "Once the decedent is identified, surviving family members can be identified through readily accessible public information." *Id.* "It is reasonably foreseeable that FDA's public disclosure of redacted versions of the requested [ ] autopsy reports would harm surviving family

10

members because Plaintiff or any member of the public can combine the information it receives with information in the public domain to identify the decedents and their next of kin." *Id.* ¶ 19.

FDA's averments under penalty of perjury—that the information it is shielding under Exemption 6 can be used to identify the decedents and, thereafter, their next of kin—are afforded a presumption of good faith. *See, e.g.*, *Wattleton v. Dep't of Just.*, No. 22-5337, 2023 WL 6531751, at *1 (D.C. Cir. Oct. 5, 2023) (summarily affirming and reiterating that "government's declarations in FOIA cases are entitled to presumption of good faith"); *Eddington v. Dep't of Def.*, 35 F.4th 833, 837 (D.C. Cir. 2022); *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991). Plaintiff's lone piece of evidence that it offers to rebut the presumption is an autopsy report that it has redacted (ECF No. 31-3). Here, the relatively small universe of responsive records and the public attention paid to COVID-19 bear special weight. While undoubtedly most individuals would look at the redacted autopsy report and be unable to identify, at least on first blush, the name behind the redactions, any individual who knows that a particular individual's death would likely create a responsive record (i.e., the individual died after receiving a COVID-19 vaccination) and who has minimal information about that individual (information which can often be readily gleaned from publicly accessible records, *see* Hyder Decl. (ECF No. 21-4) ¶ 14), would be able to identify the individual in record time.

As FDA previously explained the last time Plaintiff elected to file the redacted autopsy report, the invasion to privacy is often most unwanted when it allows an individual who was close to the decedent to learn of the decedent's private medical and related information. *See* Def.'s 1st Reply (ECF No. 23) at 12 n.3 ("Perhaps the surviving family member who allowed Plaintiff to file a redacted version of a decedent's autopsy report on the docket had no issue with disclosing that decedent's autopsy report to anyone who could piece together the decedent's identity, thereby

11

learning that he had a circumcised penis and 'scratches' on his wrists, Autopsy Report (ECF No. 22-2) at 5, but reasonable minds may wonder if every one of that individual's surviving family members was consulted before his autopsy report was transformed into a legal prop."). Individuals close to the decedent are even more easily able to use bits of personal information contained in the autopsy report to identify the decedent, and it is impossible for a FOIA processor to be confident, in a universe so small, given how very few "deaths following COVID-19 vaccination" there were, Declaration of Beth Brockner Ryan ("Brockner Ryan Decl.," ECF No. 21-3) ¶ 6, that disclosing certain pieces of personal information would not allow the decedent to be identified. *See* Teter-Gossmann Decl. (ECF No. 30-2) ¶ 13 ("[D]isclosing any of the information protected by Exemption 6 is reasonably likely to result in foreseeable harm to the decedents' families because, under a mosaic theory, individuals would likely be able to piece together this information from the autopsy reports to determine the decedents' identities."); Hyder Decl. (ECF No. 21-4) ¶ 14 ("Alone, any one of these pieces of information may not be used to identify an individual, but when combined with information in the public domain, they are likely to reveal the decedents' identities.").

The fact that Congress explicitly exempted from FOIA's disclosure provision "medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6), must be given its intended legal force. The information withheld from the Autopsy Reports that describes the individual decedents is appropriately treated as subject to FOIA Exemption 6, and it is reasonably foreseeable that its disclosure will bring harm to the family members of the deceased, forcing them to relive their loved ones' deaths. *See, e.g.*, Hyder Decl. (ECF No. 21-4) ¶¶ 12–20; Teter-Gossmann Decl. (ECF No. 30-2) ¶ 13.

12

Lastly, the Court defined the public interest in this case narrowly: "There is also a public interest at stake in releasing the autopsy reports, to the extent that any of the reports conclude that a COVID-19 vaccine caused the adverse event (in this case, death)." Mem. Op. (ECF No. 26) at 10 (citing Declaration of Narayan Nair ("Nair Decl.," ECF No. 21-5) ¶ 10). In other words, the public interest identified by the Court is whether a particular Autopsy Report concluded that a particular death was caused by the vaccine. *See id.* Thus, at minimum, nearly all information that Plaintiff seeks does not address the public interest identified by the Court. *See* Nair Decl. ¶ 7 (noting that these "reports generally cannot be used to determine whether a vaccine caused or contributed to an adverse event or illness"). The specific information within the Autopsy Reports (the decedents' occupations, marital status, year of birth, race, sex, ethnicity, date when vaccine was given, list of medications, allergies, full medical history, chronic/long-standing health conditions, circumstances as to how decedent died, date and cause of death, and toxicology test results) is untethered from the public interest at issue. The balancing analysis tilts strongly in favor of nondisclosure, and FDA reasonably foresees harm from disclosure.

## III.    The Remaining Information Contains Minimal or No Information Value.

Plaintiff continues to misread FOIA's segregability requirement. If an agency withholds a record in full to protect the identity of someone, it need not demonstrate that "every word and punctuation mark would disclose the identity of someone." *Perioperative Servs. & Logistics, LLC v. Dep't of Veterans Affs.*, 57 F.4th 1061, 1069 (D.C. Cir. 2023). That type of segregability analysis "misapprehends the [government's] FOIA obligations." *Id.* Instead, an agency "need not disclose a redacted version of [a record] if the unredacted markings would 'have minimal or no information content.'" *Id.* Thus, governing precedent does not require FDA to disclose all non-exempt portions of the Autopsy Reports, but rather, only those portions that have more than minimal

13

information content.  Indeed, Congress confirmed this by requiring disclosure only of "reasonably segregable portion[s] of a record," not any segregable portion of a record.  5 U.S.C. § 552(b).

In accordance with the Court's prior Order, FDA's *Vaughn* index identifies the material in the Autopsy Reports that is not itself subject to Exemption 6 but that 'is inextricably intertwined with exempt portions and, without production of accompanying material subject to Exemption 6, 'would have minimal or no information content.'"  *See, e.g.*, *Vaughn* Index (ECF No. 28-1) at 3 (internal quotation marks omitted; quoting *Perioperative*, 57 F.4th at 1069).  The *Vaughn* index describes this material after first specifically identifying, for each entry, all material within the record that is subject to FOIA Exemption 6, and then confirming that the nonexempt but inextricably intertwined material is "all remaining material on the report, which consists of standardized form language and headings."  *See, e.g.*, *id.*

The D.C. Circuit confronted a similar argument in *Perioperative*, an Exemption 6 case in which an entire record was withheld in full.  *See Perioperative*, 57 F.4th at 1069.  As the court explained there:

> According to [plaintiff], "it is simply impossible that every word and punctuation mark would disclose the identity of someone!"  Appellant's Br. 26.  But this misapprehends the [agency's] FOIA obligations.  It need not disclose a redacted version of the complaint if the unredacted markings would "have minimal or no information content."  *Mead Data Ctr., Inc. v. Dep't of Air Force*, 566 F.2d 242, 261 n.55 (D.C. Cir. 1977).  The Tierney declaration says that that is exactly what would happen here. . . .  The [ ] question is whether the [agency] has carried its burden to demonstrate that the complaint is exempt under Exemption 6.  It has.

*Id.*  The Teter-Gossmann Declaration, like the *Perioperative* declaration, confirms that "[e]ach entry of the *Vaughn* index identifies the specific material subject to Exemption 6, and each entry identifies the specific material that, while not itself subject to Exemption 6, is inextricably intertwined with exempt portions and, without production of accompanying material subject to Exemption 6, would have minimal or no information content."  Teter-Gossmann Decl. (ECF

No. 30-2) ¶ 12.  Accordingly, FDA respectfully submits that it has appropriately withheld the Autopsy Reports in full, that Plaintiff's motion for summary judgment should be denied, and that FDA's motion for summary should be granted.

**IV.    Even If a Dispute of Material Fact Remained, That Would Not Mean That Plaintiff Is Entitled to Summary Judgment.**

For all the reasons set forth above and in FDA's renewed motion for summary judgment, FDA believes that summary judgment should be granted to FDA.  To the extent the Court finds that any of FDA's declaratory support is insufficient, the next step procedurally would not be to grant summary judgment to Plaintiff, but to order an additional round of briefing so that FDA could address the Court's concerns further.  Plaintiff has failed to demonstrate that it is affirmatively entitled to summary judgment.

*    *    *

**CONCLUSION**

For all the reasons set forth above and in FDA's opening brief and supporting declarations,

FDA respectfully requests that the Court grant summary judgment in its favor and deny Plaintiff's

cross-motion for summary judgment.

Dated: February 7, 2025

Respectfully submitted,

EDWARD R. MARTIN, JR., D.C. Bar #481866
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division


By:  _____/s/ *Douglas C. Dreier*_____
     DOUGLAS C. DREIER, D.C. Bar #1020234
     Assistant United States Attorney
     601 D Street, NW
     Washington, DC 20530
     (202) 252-2551

*Attorneys for the United States of America*

16